SUTTON ET AL. *v*. BUNNELL ET AL.

[No. 12,764. Filed September 12, 1929. Rehearing denied January 15, 1930. Petition to transfer denied May 21, 1930.]

*Foley & Foley, Frank G. Davidson, Chase Harding, Ulric Z. Wiley, William Robison* and *Earl F. Gruber,* for appellants.

*Williams & Murphy,* for appellees.

ENLOE, J.—This action was brought by Jacob H. Fulwider against Emmit J. Sutton, Edwin Brown, Chalmers McGaughey, David Brookie, Walter L. Brown, Victor Smock, Wallace G. Himmelwright, James B. Wilson, Sterling Falloon, Fred W. Shideler, George A. H. Shideler, John C. Henderson, Fielden Morin, Thomas E. Evans and Walter C. Kimler, to recover damages alleged to have been sustained by reason of fraud, alleged to have been practiced upon him, in the sale of certain corporation stocks. Pending the determination of the cause in the court below, said Jacob H. Fulwider died, and upon motion duly made in that behalf, his executors, Leota Bunnell, Walter A. Fulwider and Benjamin F. Fulwider, were substituted as plaintiffs herein.

The cause being at issue, and coming on for trial before the court, a special finding of facts and a statement of conclusions of law were requested, and thereupon the court found the facts specially and stated conclusions of law favorable to said plaintiffs. From the judgment

rendered upon the conclusions of law stated, this appeal is prosecuted. Appellants Sutton and Kimler have assigned error as to the conclusions of law stated, error in overruling their joint and several motions for a *venire de novo*, error in overruling their motion for a new trial, and error in amending the finding of facts as originally found and stated by the court, and also the amending of conclusions of law stated thereon. The appellants, Walter L. Brown, Victor Smock and Wallace G. Himmelwright have jointly and severally, in substance, assigned the same errors. Appellant Chalmers R. McGaughey, individually, and appellant Edwin Brown, individually, have assigned substantially the same errors, thus making, in effect, four separate appeals.

The controlling facts as found by the court are, in substance, as follows: For several years prior to July, 1917, Standard Brick Company, an Indiana corporation, with a capital stock of $250,000, was operating a plant for the making of brick near Crawfordsville, Indiana, and was manufacturing "smooth pressed brick"; that said corporation owned 10 acres of land on which its plant was situated; that, about the year 1912, defendant Edwin M. Brown became interested in the shale deposits about Crawfordsville, and began acquiring stock of said company; said Brown also succeeded in interesting one P. C. Somerville, a banker of Crawfordsville, in said matter, and these two acquired a controlling interest in the stock of said company, and employed one J. R. Thomas to take charge of said plant and its operation; that some enlargements and improvements were made, and in October, 1915, through and by the intercession of said Brown, Fred Coulter of Frankfort, Indiana, was induced to purchase the interest of said Somerville in said company, the same being 355 shares of its corporate stock; that said Coulter, in turn, interested Walter L. Brown, Victor Smock and Wallace G. Himmelwright,

citizens of Frankfort, Indiana, in said company, and induced each of said parties, who were then and theretofore business associates of said Coulter in other enterprises, to purchase, at a price of $6,000 to each, one-fourth of the shares of stock held by him.

The court also found that, at the time said Walter L. Brown, Smock and Himmelwright purchased their said stock, the plant of Standard Brick Company was in a run-down and depleted condition, and was able to make as a maximum, only 1,000,000 brick per year; thereafter, said Walter L. Brown, Victor Smock and Wallace G. Himmelwright became interested in said company, and along with Coulter and Edwin M. Brown they proceeded to purchase new machinery and rebuild said plant, and to place it in a condition in which it could make from 10 to 15 million brick per year.

It was also found that said Coulter was a prominent and successful business man of Frankfort, Indiana; that he was a man of great wealth, and connected with various important enterprises in the city of Frankfort and other places, and that his judgment was at all times relied upon by his associates in the brick enterprise at Crawfordsville; that he investigated said brick enterprise and the persons connected therewith before purchasing the stock of said company, and at all times, to the time of his death, had great faith therein and in its possibilities, and believed and repeatedly stated to his associates that the said shale lands were of wonderful value, and that they would be able to make a tremendous success of the enterprise; that he urged his associates to acquire more shale lands for the company, asserting his belief that, in time, these holdings would prove to be of very great value; that, after Coulter acquired his stock, he was at once made a director and then president of said company; that in January, 1916, Walter L. Brown became a director, and, in 1917, Victor Smock was chosen

as one of the directors, Edwin M. Brown being at all times after he acquired his stock in 1912, up until said company was dissolved, one of the directors thereof; that said Coulter was a director from the time he acquired stock in 1915 until his death in 1917, and his associates, in Frankfort, entrusted to him all the details of the management of their interests in said corporation.

The court further found that, after said J. R. Thomas became the manager of said plant, he succeeded in enlarging it and in getting the daily production of brick up to 50,000; that, during this time, extensive and expensive machinery was added, the building enlarged, additional kilns built, and the output increased to approximately 15,000,000 brick per year; that, to accomplish this result, Edwin M. Brown, Walter L. Brown, Fred Coulter, Victor Smock and Wallace G. Himmelwright, severally, advanced money to the said corporation in the aggregate of many thousands of dollars; that, in the meantime, the production was changed from the smooth brick to the rough or "mat face" brick, which was more salable, and that new and heavier machinery was added so that paving brick might also be manufactured.

The court also found that the plant of said corporation was located on the east side of the Monon railway, and that the bulk of the shale lands owned by said company was on the west side of said railway and not convenient for operation by said plant; that Thomas, as manager, urged a further enlargement of the said plant so as to obtain volume of production at a greater profit; that an engineer was obtained, who submitted plans for a complementary or supplemental unit to the south of their existing plant, at a cost of about $100,000, and which supplemental unit would have doubled the production of the plant, but this matter was abandoned because of the disadvantages arising from the location of the plant

with reference to shale lands owned; that, as early as 1916, Thomas suggested to Edwin M. Brown that the company should acquire additional shale lands for its production requirements, and also for the purpose of preventing such lands near the plant from falling into the hands of competitors; that, on October 26, 1916, Edwin M. Brown, without the knowledge of any of his associates, purchased the land known as "the Everson farm," consisting of 130.6 acres, and surrounding the plant of said company, for the sum of $13,400.

It was also found that said Coulter had determined, shortly after purchasing said stock, that the only way to manage and operate said plant successfully and so as to make the investment profitable was to enlarge and rebuild said plant and thereby increase its capacity, and, at the same time, reduce the overhead expenses thereof; that, with this end in view, he determined upon the organization of a larger company, so that, from the proceeds derived from the sale of the stock and bonds of such larger corporation, funds would be in hand with which to expand said plant and to purchase additional shale lands so that the plant would have sufficient material to last it indefinitely, and that, to accomplish the above objects, said Coulter, in 1916, set about organizing the Standard Brick Company, but, before said organization could be perfected, said Coulter died in March, 1917; but, prior to his death, he urged his associates, Walter L. Brown, Victor Smock and Wallace G. Himmelwright to proceed with the said matters as planned; that, in July, 1917, the Standard Brick Company was incorporated with a capital stock of $800,000, one-half of which was common stock, and one-half of which was preferred stock, carrying seven per cent cumulative dividends; that it was provided in the articles of incorporation that the said common stock should not be paid for in money, but it was to be issued in connection with the taking over of

the property of said Standard Brick Company, and also to be issued and given as a bonus to those purchasing said preferred stock of the new company; that the stock-holders of the old company exchanged their stock in such company for stock in the new company on the basis of one share of the preferred stock and 10 shares of common stock for each share of stock held in the old company, the 10 shares of common stock in the new company being of the same face value as one share in the old company; that, on February 28, 1919, all the preferred stock in the new company had been issued, and about $189,000 of the common stock had also been issued; that, as a part of the program of incorporating the new company and the operating of its business, it was also planned to issue bonds to be secured by a first mortgage upon the property of such new company, except its liquid assets, and upon such property as it might thereafter from time to time acquire, the proceeds of such bond sale to be used, along with proceeds from the sale of stock, in acquiring additional shale lands, expansion of plant, etc.; that bonds of said company in the amount of $200,000 were issued as of December 1, 1917; that, concurrently with these proceedings, Standard Brick Company was dissolved, and all its assets transferred to the new company, which assumed all the debts and liabilities of the old company.

The court further found that said Coulter, during his lifetime, had negotiated with Edwin M. Brown for the purchase, by the company, of the Everson Farm, but that, such purchase was not consummated during the life of said Coulter; that, after the death of said Coulter, and after the organization of the Standard Brick Company, the directors thereof bought said farm, for said company, paying therefor $13,400, in cash, and also giving to said Brown $75,000 par value of the preferred stock of said company; that in March, 1917, Edwin M. Brown, in the name of "Edgar A. Rice," obtained an

option on 141.9 acres of land owned by one Fleming, and lying to the north of said Everson Farm; that the Monon railway crosses said Fleming Farm, which farm was fairly level and adaptable to a "plant site"; that in February, 1918, said Edwin M. Brown closed his deal for the Fleming Farm, giving as a consideration therefor $25,000, of which the sum of $7,500 was paid by his assuming a mortgage thereon in that sum; that the deed to said land was taken in the name of Edgar A. Rice, who paid no part of the purchase price of said land and held the title thereto simply as trustee for Edwin M. Brown; that, in the latter part of 1917, while said Brown still held said option on said land, he sold the same to the Standard Brick Company for a consideration as follows, to wit: $15,000 in cash, $60,000 par value of the first mortgage bonds of the Standard Brick Company, and the assumption by purchaser of the aforementioned mortgage of $7,500, all of which consideration, cash and bonds, was, by said Rice, at once turned over to said Edwin M. Brown; that Fleming conveyed said farm to Rice on February 19, 1918, and on the same date, Rice, his wife joining, conveyed said land to the Standard Brick Company; that in said transaction said Edwin M. Brown did not disclose to his associates, directors of the Standard Brick Company, that he was the actual owner of said option and of said farm, and his said associates did not know that he was such owner, and believed said Rice to be the actual owner of said farm; that, in connection with the sale of said farm, said Edwin M. Brown caused to be issued to himself, without the knowledge of his said associates, $25,000 of the preferred stock of the Standard Brick Company.

The court further found that two days after the Standard Brick Company was incorporated, the board of directors thereof passed a resolution concerning the purchase of the Everson and Fleming farms and to pro-

vide the funds necessary to consummate such purchases, but the minutes of such meeting were never copied into the record of minutes of the meetings of the board of directors, but, on December 18, 1917, a certified copy of such minutes was entered of record in the Miscellaneous Record, in the Recorder's office of Montgomery County, Indiana; that, by said resolution, it was resolved to issue the bonds of the Standard Brick Company in the sum of $200,000, to be dated December 1, 1917, and drawing interest at six per cent per annum, payable semi-annually from date of issue, and said bonds to mature in five years, and to be secured by mortgage upon all the property of the company then owned, and also upon the said farms to be acquired, and naming the Crawfordsville Trust Company as trustee in said matter, which bonds were thereafter issued and said mortgage executed.

The court further found that, after the death of Fred Coulter, the appellants Walter L. Brown and Wallace G. Himmelwright were not willing to invest further in the enterprise, and did not want to assume the burden of going ahead with it in the larger way proposed, because of their other business interests, and requirements on their time and capital, and expressed their desire to sell their holdings and let others who could finance the enterprise take over the same; that appellant Smock was willing to retain his interest but did not want to give it his personal attention or be connected with it in an official capacity; that said Edwin M. Brown was president and manager of the Central States Life Insurance Company, in which he held an extensive interest, and desired to sell his holdings and give all of his time to that company; that these directors accordingly recommended to the stockholders of the Standard Brick Company that if an advantageous sale of the property of said brick company could be consummated so as to fully provide for all the stockholders, that said corporation and all its

property should be sold, which recommendation the stockholders fully approved.

The court also found that, after the incorporation of the Standard Brick Company, it sold more than $100,000 of its preferred stock, and that this money, with other moneys borrowed from banks and from individuals, was used in paying for plant extensions and other requirements of the company; that the profits of the Standard Brick Company, except that used in paying dividends, was also used in extension and development; that the Standard Brick Company was operated at a loss up to May 31, 1919, including dividends paid, of $52,191.96; that in the latter part of 1918, Edwin M. Brown got in touch with F. W. Shideler and Company of Indianapolis, through its president F. W. Shideler, which company was engaged in selling securities and in financing and promoting enterprises, and the said Edwin M. Brown and Fred W. Shideler, at such time, conspired together and with each other to cheat and defraud divers citizens of the State of Indiana and the public generally, by and through the incorporation, organization and promotion of a new corporation; that, pursuant to such conspiracy and as a part thereof, the said Fred W. Shideler and Company, through said Fred W. Shideler, proposed to purchase and caused to be purchased the stock and assets of the Standard Brick Company by Chalmers R. McGaughey, Sterling A. Falloon and James B. Wilson, and caused them to organize a new corporation with sufficient capital that, from the sale of its securities, it could purchase the stock and assets of the Standard Brick Company, and construct and operate a large brick manufacturing enterprise, so as to efficiently and profitably develop the shale deposits so purchased, and further proposed, as an inducement to the officers, directors and stockholders of the Standard Brick Company, to aid in carrying out this proposition, that the new corporation

pay to the holders of all of the stock of the Standard Brick Company cash, at par, for such preferred stock, giving to such stockholders the option of taking preferred stock in the new corporation in lieu of cash, and to take over the common stock of the Standard Brick Company by exchanging therefor, dollar for dollar, either preferred or common stock of the new corporation to be formed, and that the new corporation would assume and pay the obligations of the Standard Brick Company, including interest on dividends on its preferred stock then outstanding.

The court also found that, pursuant to such conspiracy and as a part thereof, the said Edwin M. Brown reported this prospective sale to the board of directors of the Standard Brick Company, and also, from time to time, reported the progress of his negotiations and the details thereof, as the same were developed, and, in December, 1918, said board of directors determined that the same should be submitted to their stockholders, and, in January, 1919, said proposal was submitted to said stockholders, at their annual meeting, at which more than three-fourths of the stock of said company was represented; that the same was discussed, and, by resolution, said proposal was accepted as follows: The new company was to pay all outstanding obligations of the Standard Brick Company, to pay all preferred stockholders par value for stock held, and all accrued interest on such stock; also, the holders of outstanding common stock of the Standard Brick Company were to have the privilege of exchanging such common stock for either common or preferred stock in the new company, as they might elect; after the passage of this resolution, Edwin M. Brown continued his negotiations with Shideler and Company, and, as a result thereof, on February 21, 1919, at the request of Shideler and Company, Edwin M. Brown, Walter L. Brown and Earl Gruber, an attorney repre-

senting Walter L. Brown, Victor Smock and Wallace G. Himmelwright, went to Indianapolis and met Fred W. Shideler, president of F. W. Shideler and Company, and Ulric Z. Wiley, who was the attorney of F. W. Shideler and Company; prior to this meeting, no person except Edwin M. Brown, of those interested in the Standard Brick Company, had ever met Fred W. Shideler, or had any knowledge of his company or business except as told them by said Edwin M. Brown; that, in said conference, the details of the proposed purchase of the Standard Brick Company by or through F. W. Shideler and Company were gone over, and a proposition in writing was drawn by Judge Wiley and submitted to said Gruber, but, this proposition not being satisfactory, said Gruber drew and submitted a counter proposition; that the contract as drawn by said Gruber provided that it should be executed by George A. H. Shideler, Charles McGaughey and Charles F. Holliday, the persons named in the agreement drawn by Judge Wiley; that said named persons then lived respectively at Jeffersonville, Greencastle and Parker City, Indiana; that, on February 28, 1919, when Edwin M. Brown returned to Indianapolis with the Gruber contract, these persons were not in the city, and, at the suggestion of Fred W. Shideler, the names of Charles R. McGaughey, Sterling Falloon and James B. Wilson, persons living in Indianapolis were substituted in said contract; that these substituted parties had, at the request of Fred W. Shideler, on February 26, 1919, become the incorporators of the new company theretofore proposed to be formed, "the Standard Shale Brick Corporation"; that permission to make the said substitution was given by said Walter L. Brown, Victor Smock and Wallace G. Himmelwright, and thereupon said contract of sale was formally executed by said Wilson, McGaughey and Falloon of the first part, and by the Standard Brick Company, by

Walter L. Brown, its president, as a party of the second part. The court also found that said Wilson, McGaughey and Falloon were each persons of no financial standing, except that said McGaughey was worth approximately $8,000, and that none of the parties, appellants herein, made any investigation as to such financial standing, and that said Wilson, McGaughey and Falloon never investigated the property of said brick company, either as to its assets or its liabilities.

The court further found that it was understood by all of the parties to said transaction that Fred W. Shideler, doing business as "F. W. Shideler and Company," should be the fiscal agent of the proposed new corporation when the same was organized, and, as such, should put on a "campaign" to sell the preferred stock of such new company to the public generally, and *that there should and would be a board of "dummy" directors to sign the articles of incorporation of said proposed new corporation*; that, pursuant to said conspiracy by and between said Edwin M. Brown and Fred W. Shideler, said Wilson, McGaughey and Falloon, at the request and direction of Edwin M. Brown and Fred W. Shideler entered into said contract of sale for the plant and assets of the Standard Brick Company; that, by the terms of said contract, they were, among other things, to incorporate the Standard Shale Brick Corporation in Indiana, with a capital stock of $5,000,000, of which $2,000,000 should be common and $3,000,000 preferred, to pay indebtedness and redeem stock of the Standard Brick Company, as hereinbefore set forth, there being a schedule of said indebtedness attached to said agreement; this schedule showed an indebtedness of $181,947.98, and assets, plant, materials, product, finished and unfinished, of $203,455.31, to which was added 295 acres of shale land, plant site, good will, etc., at a valuation of $108,337.93; that, on February 28, 1919, an agreement was entered

into between the Standard Shale Brick Corporation, by its president, James B. Wilson, and F. W. Shideler and Company, by F. W. Shideler, president, whereby the matter of the sale of the stock of Standard Shale Brick Corporation was placed in the hands of F. W. Shideler and Company, and it was, in said contract, among other things, agreed that purchasers of said preferred stock should be given a bonus of 25 per cent in common stock; that F. W. Shideler and Company should have a commission of 30 per cent upon all preferred stock sold; and that, on the same day, the new corporation, by resolution duly adopted, assumed and agreed to pay all obligations assumed by the said incorporators in their said contract with the Standard Brick Company; that immediately after the organization of said Shale Brick Corporation, the said Wilson, McGaughey and Falloon were each given 10 shares of the common stock of said corporation to qualify them to act as directors of said company; that they were such directors from the time said company was organized until May 1, 1919, and, during such time, Wilson was president, Falloon was vice-president, and that neither of said parties had invested any money in said corporation, and that all of said directors were simply "straw men" and "dummy directors," and under the control of Fred W. Shideler; that said McGaughey was on said board of directors and acted as secretary-treasurer of said corporation from February 28, 1919, to April 19, 1921; that on May 1, 1919, said Wilson resigned from said board, pursuant to a previous understanding with Fred W. Shideler, and George A. H. Shideler was elected to take his place; that George A. H. Shideler was president of said corporation from May 1, 1919, until April 19, 1921; that said Falloon likewise resigned from said board May 1, 1919, and one George E. Jenks was selected to take his place; that Edwin M. Brown became a member of said board January 18, 1921, and served as

a director until April 19, 1921; that David Brookie became a member of said board January 18, 1921, and served until April 19, 1921, during which time he also was the vice-president; that Fielden Morin became a member of said board March 31, 1921, and served thereon until April 19, 1921.

It was also found that Fred W. Shideler, acting for himself and "on behalf of his co-conspirators," organized a large and strong selling force to call upon divers citizens of this state and the public generally, for the fraudulent purpose and with the fraudulent intent of selling stock in said Standard Shale Brick Corporation, and also prepared and sent through the United States mail letters and circulars with reference to said Standard Shale brick corporation, all fraudulently designed to influence divers citizens and the public generally to purchase stock in said corporation, said letters and circulars having been sent from November, 1919 to January 20, 1921; that one of said letters so sent was, in November, 1919, sent to Jacob H. Fulwider, and, in said letter, it was, *inter alia,* stated that, before said F. W. Shideler and Company offered any stock for sale they had made a complete examination to determine whether the line of business of such corporation was staple, that its profits were at least three times the interest charges on its preferred stock, that the assets of the company were at least twice the amount of the issue; said letter also contained the representation that F. W. Shideler and Company were represented on the board of directors until such time as all preferred stock had been redeemed; that the Standard Shale Brick Corporation had a sinking fund to take care of its preferred stock; that it had issued no bonds or other indebtedness on its property; that the directors of said corporation had just authorized a dividend of 7 per cent on its common stock, payable one and three-fourths per cent in January, 1920, and, that this dividend was made

possible by the "high efficiency" of the plant; that said plant was making even a larger profit than had been anticipated; that November 28, 1919, said Shideler sent another letter through the United States mail to divers citizens of this state and to Jacob H. Fulwider, in which it was, *inter alia*, stated that the profits of the business of said corporation had so far exceeded their hopes; that the entire output of the plant for the year 1920 had been sold at a substantial profit; that they would pay dividends on the common stock commencing with January, 1920; that with bonus of common stock received with purchase of preferred stock, the investment would net eight and three-fourths per cent on money invested; that they were holding some of the remainder of this stock for "present customers," and would not dispose of it to outsiders "until we hear from you"; that on December 19, 1919, another letter was sent by Shideler to Fulwider, in which, speaking in reference to said preferred stock, he said: "the earnings of the company are so large that, in addition to preferred shares paying 7 per cent, the Board of Directors have declared dividends at the rate of 7 per cent on the common shares, also payable quarterly"; that January 26, 1920, Shideler sent by United States mail another letter to said Fulwider in which it was stated: "We wish to impress upon you that F. W. Shideler and Company, before accepting any security for sale, made a thorough investigation of the same to see that the basis is solid and the prospects for the future are such that the corporation will at all times be able to pay its dividends. And, in this case, we find the assets several times in excess of the amount of preferred stock that will be issued, and, as this preferred stock is an absolute lien on every asset of the company, your principal is absolutely safe. The earnings are such that the dividends on your preferred stock are assured, and, at the stockholders' meeting held in the

city of Crawfordsville, on January 20, 1920, the report of the General Manager, Mr. E. M. Brown, showed that the earnings of the corporation at this time, and with the future business that they have on the books, will permit them to maintain a dividend on the common stock, in the same amount as that being paid on the preferred stock for the year 1920"; on March 10, 1920, another letter was sent by United States mail by Shideler to said Fulwider, in which the above statements, with others made in the former letters were repeated; on August 17, 1920, Shideler sent another letter to Fulwider, in which he stated, *inter alia,* that the capacity of their plant had been increased until it was more than 50,000 brick per day.

The court further found that Jacob H. Fulwider believed said statements to be true and relied upon them, and, acting upon such belief and reliance, purchased $34,500 of the preferred stock of said company and $4,500 of its common stock, paying therefor $39,000; also, that each and all of the statements and representations so made by said Shideler were false, and were made for the purpose of defrauding the said Fulwider. It was also found that the Standard Shale Brick Corporation was incorporated February 26, 1919, and went into the hands of a receiver May 6, 1921; that, during said time, Shideler had carried on an active and strenuous stock-selling campaign; that, during said time, preferred stock to the amount of $1,318,220 was sold for cash, $271,680 was exchanged for preferred stock of the Standard Brick Company, and $36,800 was exchanged for common stock in the Standard Brick Company; and that the Standard Shale Brick Corporation, from the proceeds of the sale of said stock, received only the sum of $888,615, in cash, and cash items in the sum of $1,710.43.

The court further found that, from February 28, 1919 to December 31, 1920, Edwin M. Brown had in his possession and under his control, for and in behalf of

Standard Shale Brick Corporation, money derived from the sale of said stock, and from the sale of brick made by the Standard Brick Company, in the sum of $925,239.67; that, during no part of said time, was said Brown an officer of Standard Shale Brick Corporation, and was not under any bond for the handling of said money, but was, during said time, an officer of the Standard Brick Company; that in May, 1920, the said Edwin M. Brown was, by the directors of the Standard Brick Company, viz., Edwin M. Brown, Walter L. Brown, Victor Smock, and Wallace G. Himmelwright, voted a salary of $6,000 for his services as manager of said company for the years 1916, 1917, 1918, 1919 and 1920.

The court further found that, at the time of the incorporation of the Standard Shale Brick Corporation, said Edwin M. Brown, Walter L. Brown, Victor Smock, Wallace G. Himmelwright, Fred W. Shideler and Chalmers R. McGaughey caused to be placed upon the books of the Standard Brick Company, as an item of its assets, the lands of said company, approximately 300 acres, at a valuation of $900,000, but that, at that time, the said lands, including the plant site, all real estate holdings and good will of said company were reasonably worth, at their fair market value, not to exceed $108,337.93, and that they were so valued in the aforementioned contract of sale; that the said parties also fixed and entered upon the books of said company, as an item of its assets, the sum of $135,893.77, as being the value of "plant and equipment" of said company, but that the fair market value of said plant and equipment at that time did not exceed $95,135.38, which was the valuation placed thereon in said contract of sale; that said items were so placed upon said books for the purpose of making it appear that the Standard Brick Company, after the redemption of all of its preferred stock amounting to $400,000, and the payment of its outstanding indebtedness, was entirely

solvent and had a surplus of $597,604.89; that the Standard Brick Company was, at that time, actually insolvent, and its assets were $458,329.46 less than its liabilities, outstanding stock included, which facts were fully known to Edwin M. Brown, Walter L. Brown, Victor Smock, Wallace G. Himmelwright, Fred W. Shideler and Chalmers R. McGaughey, and that said surplus was purely fictitious, and was made up solely by boosting the value of said land and plant, and for the purpose and with the intent of deceiving the citizens of Indiana, the public in general, and Jacob H. Fulwider, to whom a copy of said statement of assets was given.

The court further found that the Standard Shale Brick Corporation was, at all times after it executed the aforementioned contract with F. W. Shideler and Company, wholly insolvent, and that neither its common nor its preferred stock was, at any time, of any value; that the Standard Shale Brick Corporation never made a brick nor operated said plant, nor made any profits whatsoever; that it never acquired title to said real estate of the Standard Brick Company, or any other real estate, or to the plant, machinery, equipment and assets of the Standard Brick Company; that it never took up all of the stock, common and preferred, of the Standard Brick Company, as provided for in said contract, and said corporations were, at all times, separate and distinct corporations, but the Standard Brick Company was operating said plant for the account of the Standard Shale Brick Corporation.

The court further found that the Standard Brick Company, during the years 1919 and 1920, operated at a net loss of $7,581.28, and from January 1, 1919, to May 6, 1921, when it went into the hands of a receiver, it had no surplus; that out of the $100,000 of preferred stock received by Edwin M. Brown, as before mentioned, he sold $33,450 thereof, par value, for $33,450 cash, and

transferred the remainder of his said stock, $66,550, to the Standard Shale Brick Corporation for an equal amount of its preferred stock, of which he sold, during the said stock-selling campaign hereinbefore referred to, $43,500 for cash in that amount; that, upon stock of the Standard Shale Brick Corporation which was issued, there was paid as being dividends earned by said corporation, prior to January 1, 1921, $94,051.21 on its preferred stock and $22,480.34 upon its common stock, all of which, with the knowledge and consent of Emmit Sutton, Walter Kimler, Edwin M. Brown, Fred W. Shideler and Chalmers R. McGaughey, was paid, not from profits earned, but from proceeds from the sale of preferred stock of said corporation.

The court further found that Edwin M. Brown introduced appellants Sutton and Kimler to F. W. Shideler, and was instrumental in getting them employed as agents of Shideler to sell the stock of Standard Shale Brick Corporation; that, as such agents, Kimler and Sutton were well acquainted with the condition and assets of the Standard Brick Company and knew the fair market value of the same; that, commencing in April, 1919, and between that time and September 24, 1919, Sutton and Kimler called upon said Fulwider at his home, in the country, in Montgomery County, Indiana, with the purpose, design and intent of selling him stock in the Standard Shale Brick Corporation; that they called at said home between said dates some 12 or 14 times; that, upon one occasion, they took Fulwider to the said plant, pointed out to him the 135 acres, the Fleming Farm and the Everson Farm, and by this talk created in the mind of said Fulwider, as they then well knew, the belief that said property was the property of and owned by the Standard Shale Brick Corporation; that they took said Fulwider to Edwin M. Brown, who told and represented to said Fulwider that the Standard Shale Brick Corpora-

tion and the Standard Brick Company had been consolidated and that the property was all owned by the Standard Shale Brick Corporation; that they also took Fulwider to the office of Fred W. Shideler, at Indianapolis, Indiana, for the purpose and with the intention of having said Shideler talk to said Fulwider about the Standard Shale Brick Corporation, and, at said time, said Shideler told and represented to said Fulwider that the said corporation was paying for everything that was being done and that it was a paying enterprise; that each and all of the statements made by said Brown, Kimler, Sutton and Shideler were false, and known by each and all of said parties to be false; that they were made for the purpose of deceiving said Fulwider, and thereby causing him to purchase stock of the said corporation; that said statements were believed by said Fulwider to be true and were relied upon by him in purchasing stock in said company; that, relying upon said statements of Sutton, Kimler, Brown and Shideler, and believing said statements to be true, and believing that the statements contained in the letters and printed matter sent to him through the United States mail by said parties were true, and, in full reliance thereon, said Fulwider purchased stock in said corporation of Kimler and Sutton to the amount of $34,000, preferred, and $9,750, common, and one bond, $1,000, of said the Standard Brick Company.

The court further found that September 18, 1919, said Edwin M. Brown, general manager, reported to the directors of Standard Shale Brick Corporation that the net profits of said corporation for the month of June, 1919, were $4,092.35, for the month of July, 1919, $5,182.14, and for August the sum of $6,077.99, and that he believed the profits for September would exceed the earnings of any of these months; that, at the November and December meetings of said board of directors,

said Brown reported that the business being done was satisfactory, that profits were being earned, .and he recommended that the board declare dividends upon both its common and preferred stock.

The court further found that Walter L. Brown, Wallace G. Himmelwright and Victor Smock never, at any time, knew Jacob Fulwider, prior to January 17, 1921, at which time said Brown saw, but did not meet said Fulwider, and did not know, prior to January 17, 1921, that said Fulwider was a purchaser of stocks and bonds as before found; that none of said therein-named parties did any act, or made any statement for the purpose of defrauding said Fulwider or any other person, except by and through said contract of sale and their acts in the carrying out of said contract; that, after the death of Fred S. Coulter, March 29, 1917, said Brown, Himmelwright and Smock were each busy with their private affairs, and entrusted the management of the business of the Standard Brick Company to Edwin M. Brown, and the management of the plant to one James R. Thomas, and thereafter, said Walter L. Brown, Himmelwright and Smock had nothing whatever to do with the keeping of the books of the Standard Brick Company; that, as a matter of convenience, the meetings of the board of directors of said company were usually held at Frankfort, Indiana, and the records of such meetings thereafter written up by said Edwin M. Brown.

The court further found that, at the time the Standard Brick Company entered into said contract of sale with Wilson, McGaughey and Falloon, February 28, 1919, said brick company was a going concern, with a large business, had signed contracts for a large amount of brick, and had a large number of customers in Indiana and elsewhere in the United States, and, as a going concern, possessed a value over and above the actual cash value of its physical and liquid assets, and had a "good

will" in said business which was of value, and that the same was considered and included in said contract of sale.

The court further found that Chalmers R. McGaughey became one of the incorporators of Standard Shale Brick Corporation at the request of Fred W. Shideler; that it was agreed and understood that the incorporators, McGaughey, Wilson and Falloon, were to act only temporarily, for the purpose of organizing said corporation, and were then to resign; that said McGaughey, before the organization of said company, was informed by said Shideler and by Edwin M. Brown that the Standard Brick Company was a going concern, manufacturing brick from shale and selling the same; that said company owned about 300 acres of valuable shale lands in Montgomery County, Indiana; that said McGaughey knew that there was a large demand for such brick for building purposes and for road construction, and that brick of the quality manufactured by the Standard Brick Company commanded high prices; that he also learned through said parties that the officers of said brick company desired to dispose of its lands, plant, and assets, and that, to that end, a new corporation was to be organized to take over said property, under a contract of purchase, and to build a new plant of larger capacity; that he had knowledge as to the shale-brick business, and believed, with reason, that shale brick could be produced in large quantities at the Crawfordsville plant, and sold at a large profit.

The court further found that said McGaughey never had any personal conferences, talks, or communications with his codefendants Sutton, Edwin M. Brown, Walter L. Brown, Brookie, Smock, Himmelwright, Wilson, Falloon, George A. H. Shideler, Henderson, Morin, Evans or Kinder in relation to the sale of stock of Standard Shale Brick Corporation; that, prior to the organization of said corporation, he had a desk in the

office of F. W. Shideler, in Indianapolis; that he had been and was engaged in the business of selling stocks and bonds, and that he had an arrangement with F. W. Shideler and Company to sell certain stocks and bonds for them upon commission; that, after the organization of the Standard Shale Brick Corporation, and after its stock had been placed upon the market, he made a contract with F. W. Shideler and Company to sell said stock in certain designated territory, and did sell, by himself and his agents, a large amount of said stock; that he allowed his commission on stock sold to remain unpaid in the hands of F. W. Shideler and Company; and that he also advanced to F. W. Shideler and Company money to meet the pay roll of the Standard Brick Company, until F. W. Shideler and Company was indebted to him in the sum of approximately $18,000; that in lieu of such money, which was payable to him upon demand, he accepted from F. W. Shideler and Company preferred stock of Standard Shale Brick Corporation of the par value of $20,300, and common stock, as a bonus, of the par value of $5,000, all of which stock he held, kept, and still owns; that he never met or had any knowledge of Jacob Fulwider prior to January 17, 1921, and had nothing to do with the sale of any stock to him, except as such sale may have been influenced by his having helped to organize the Standard Shale Brick Corporation, and his having been a party to said contract with the Standard Brick Company, and also his conduct as a director in voting unearned dividends upon the stock of said Standard Shale Brick Corporation.

The court further found that Walter L. Brown, Wallace G. Himmelwright and Victor Smock, at the time they entered into said contract of sale with Wilson, McGaughey and Falloon, were acting as directors of the Standard Brick Company, and did so in pursuance of a resolution of the stockholders of said company thereto-

fore passed at their annual meeting in January, 1919; that said directors, in so making said contract of sale, were acting for and on behalf of the stockholders of the Standard Brick Company, including themselves, and were not acting for and on behalf of themselves alone as individuals, and were not selling any property belonging to themselves as individuals, except the stock therein personally held by each of them, and that said directors in so acting were also selling the property of the Standard Brick Company.

It was also found that Edwin M. Brown and Fred W. Shideler conspired together, "each with the other," to cheat and defraud divers citizens of the State of Indiana, and the public generally, including Jacob H. Fulwider, by selling the assets of the Standard Brick Company, and the stock thereof, to a proposed new corporation to be known as "Standard Shale Brick Corporation," which corporation was to have a capital of $2,000,000 common stock, and $3,000,000 of preferred stock, and which new company was to be organized, incorporated and promoted by Fred W. Shideler in consideration that Fred W. Shideler and Company should have the exclusive right to sell the said preferred stock upon a commission basis of 30 per cent, the stock to be sold at par; that, pursuant to such conspiracy, said Edwin M. Brown and Fred W. Shideler unlawfully and fraudulently, through the stockholders, directors and officers of the Standard Brick Company and James B. Wilson, Sterling A. Falloon and Charles R. McGaughey, caused the said contract for the sale of the assets of the Standard Brick Company and the stock thereof to be executed by the parties thereto, and caused the promotion of the Standard Shale Brick Corporation, and also caused the making of said contract designating F. W. Shideler and Company as the fiscal agents of said new corporation, to sell the preferred stock thereof, and also binding such new com-

pany to issue, upon demand of F. W. Shideler and Company, any portion or all of its common stock; that the said parties also caused the Standard Shale Brick Corporation to ratify said contract of sale of the assets of the Standard Brick Company, and the stock thereof, with the fraudulent intent and purpose thereby to cheat and defraud divers citizens of the State of Indiana, and the public generally, including Jacob H. Fulwider; that, pursuant to said conspiracy, and by means of false and fraudulent representations made by themselves in person and through others to prospective purchasers of such stock, including Jacob H. Fulwider, in respect to the value of the property of the Standard Brick Company, and by concealment of the terms of said contracts of purchase and for promotion, and by false and fraudulent representations as to the earnings of the Standard Brick Company, and of the value of stock in the Standard Shale Brick Corporation in consequence thereof, the said Edwin M. Brown and Fred W. Shideler did cheat and defraud Jacob H. Fulwider; that said Fulwider was ignorant of the falsity of such statements and representations so fraudulently made, believed them to be true and relied thereon; that said Fulwider, by reason of the fraud so practiced upon him in the sale of said stock to him, has been damaged in the sum of $38,402.86.

It is also found that Emmit J. Sutton and Walter C. Kimler, for the purpose of inducing said Fulwider to buy said stock of Standard Shale Brick Corporation, made statements to said Fulwider concerning said stock, the value of the plant owned and the business being done, including earnings of said plant, which said statements were false and known to be false by said parties at the time they were made, and which false statements were believed by the said Fulwider and acted upon by him as being true, in purchasing said stock; that, in making said statements, said Sutton and Kimler were knowingly

assisting Edwin M. Brown and Fred W. Shideler in the consummation of this said fraudulent scheme; that Chalmers R. McGaughey *unlawfully* and *fraudulently* assisted, aided and abetted in the carrying out of said conspiracy by acting as a dummy incorporator, and later as a dummy director of such corporation, and by the executing of said contracts and the ratification of said contract of sale and purchase of stock of the Standard Brick Company by the Standard Shale Brick Corporation, and that he knew, or ought to have known, that said statements and representations so made by Edwin M. Brown and Fred W. Shideler were false, and were being made with intent to defraud purchasers of said stock.

The court also found (amended finding No. 48) that prior to March 20, 1921, Edwin M. Brown, Walter L. Brown, Victor Smock, Wallace G. Himmelwright, Fred W. Shideler, Chalmers R. McGaughey, Emmit J. Sutton and Walter C. Kimler learned that said Fulwider had employed attorneys to make an investigation for him into said stock transaction, and was claiming that he had been defrauded in said transactions, and was proposing to bring suit to recover his alleged loss; that, with full knowledge of said facts on the part of each of said parties, and with full knowledge of the false and fraudulent representations used in the sale of the stock, the said Walter L. Brown, Victor Smock, Wallace G. Himmelwright and Edwin M. Brown exchanged their preferred stock in the Standard Brick Company for cash, pursuant to the terms of said contract of sale dated February 28, 1919, and received therefor in cash a part of the proceeds obtained from said fraudulent sales; that realizing that, if Fulwider brought suit to recover his said losses, it would result in the stopping of all sales of said stock, Emmit J. Sutton, Walter C. Kimler, John C. Henderson, Fielden Morin and Thomas E. Evans, on March 29,

1921, went to the home of said Fulwider, and then and there said to him that they had come to buy his stock and bonds and take over all his holdings in said company; that they would pay to him $500 in cash, and would pay to him $40,000, with interest thereon at 7 per cent from October 1, 1920, within one year from April 1, 1921, they to have and receive all dividends on stock and the interest on said bond; that said Fulwider then and there accepted said proposition and agreed to sell to said parties his said stock and bond, and said purchasers then and there drew up an instrument in writing, which was read to said Fulwider as being a contract of sale, and, acting under such belief, the said Fulwider then and there signed the same; that said instrument was not a contract of sale but only an *option contract*, by which Fulwider had given Thomas E. Evans, John C. Henderson and Fielden Morin the right, at their option, to purchase, at any time before April 1, 1922, his said stock and bond, upon the terms above set out; that, immediately upon the discovery of the fact that said instrument was only an option, said Fulwider returned the check for $500 which had been given to him and notified the said parties to said option contract that he refused to be bound thereby.

The record in this case is voluminous, more than 8,000 pages; the briefs contain about 2,000 pages, the principal brief of the appellants containing more than 900 pages; the special finding of facts is lengthy—about 140 printed pages of appellants' brief—and through all this mass, this court has been required to search in an endeavor to arrive at a proper conclusion. The transcript in this case was filed July 6, 1926, and appellants' reply brief was filed May 29, 1928. Oral argument was had December 11-12, 1928.

While we are not disposed to criticize the various counsel for the various appellants, yet, in view of the

time taken by them to prepare their brief, and, in view of the fact that there are four sets of appellants, whose interests, as such, are several, and the facts concerning each set of appellants have little in common with the facts affecting other appellants, yet, if counsel representing the various appellants severally had segregated the particular facts affecting such client, our labors would have been greatly diminished.

The material facts specially found, as they relate to the acts of appellants Walter L. Brown, Victor Smock, and Wallace G. Himmelwright, referred to by counsel as the "Frankfort Appellants," are, in substance, as follows: About October, 1915, Fred Coulter, a resident of Frankfort, Indiana, a man of great wealth and who was the owner of 355 shares of stock of Standard Brick Company, induced Walter L. Brown, Victor Smock and Wallace G. Himmelwright to purchase each a one-fourth of the said shares of the stock of said company; at the time of said purchase, the property and plant of said company was in a run-down condition and its out-put greatly lessened; after said parties acquired their said stock, they proceeded to rebuild said plant and purchase new machinery therefor, and place it in a condition to greatly increase its output; Coulter was president of said company, and, in January, 1916, Walter L. Brown was elected director, and in 1917, Smock also was elected director; Coulter had investigated the enterprise before he purchased his stock therein, and, at all times, had great faith therein, and urged his associates to acquire more shale land for the company; he was the active representative of his Frankfort associates and they entrusted to him, up to the time of his death, in March, 1917, all the details of the management of said company, as to their interest therein; in the matter of enlarging the plant and purchasing new machinery, these Frankfort men advanced money to the company, and individually indorsed notes

for the company, in the aggregate of many thousands of dollars; they each also purchased 88 and three-fourths shares of the preferred stock of said company; prior to the death of Coulter, he had urged the rebuilding and enlarging of the plant, and, to that end, he urged the organizing of a larger company, the selling of additional stock and bonds, and the acquiring of additional shale lands; the new corporation came into existence July, 1917, under the name of "the Standard Brick Company," and these appellants exchanged their stock in the old company for stock, common and preferred, in the new company; after the death of Coulter and after the organization of the new company, Brown and Himmelwright were not willing to further invest in the enterprise; they had other business interests which needed their time and capital, and they expressed their desire to sell out and let others, who could, go ahead with the enterprise; Smock was willing to retain his interests, but did not want to act as a director, nor be connected with the business management; he seemed willing but not anxious to sell; neither Smock nor Himmelwright was a director in the said new company; in February, 1919, said Frankfort parties, with their attorney, went to Indianapolis and had a conference with Fred W. Shideler and others relative to the sale of the property of the Standard Brick Company to a new corporation, Standard Shale Brick Corporation, then about to be organized; this latter corporation was organized February 26, 1919, by Fred W. Shideler and others, and, on February 28, 1919, a contract was entered into by said corporations, by which the new corporation was to buy and take over all the property of the old company, and was to pay all its outstanding debts and obligations, these named appellants being, at the time said contract was made, directors of the said Standard Brick Company; under this contract, the said Shale Brick Corporation took up and

discharged the indebtedness due from the Standard Brick Company to these several appellants, the said stock being taken up and the said indebtedness discharged after said appellants had learned that said Jacob H. Fulwider was claiming that he had been defrauded in the purchase of the stock sold to him in the said Shale Brick Corporation.

It was further found that these appellants never at any time, prior to January 17, 1921, knew Jacob H. Fulwider; that none of said parties ever had any conversation with Fulwider, and did not know, prior to said date, that Fulwider was a purchaser of said stock; that none of the parties did any act or made any statements for the purpose of defrauding said Fulwider or any other person, "except by and through said contract of sale and their act in carrying out said contract"; that, after the death of Fred Coulter, they entrusted the management of the business affairs of the Standard Brick Company to Edwin M. Brown, and had nothing whatever to do with the keeping of the books of the Standard Brick Company.

As to the appellant Edwin M. Brown, the material facts found are, in substance, that about 1912, he and one Somerville acquired control of Standard Brick Company; that, in October, 1915, Fred Coulter, at the instance of Brown, acquired the Somerville stock, and was at once made a director and president of said company; that, in October, 1916, without the knowledge of his associates, he bought the Everson Farm; that the Standard Brick Company was organized in July, 1917, to take over Standard Brick Company; that bonds of the new company to the amount of $200,000 were issued in December, 1917, and the old company was dissolved, the new company taking its assets and assuming its liabilities; that Brown turned over to the new company the Everson Farm, receiving therefor $13,400 in cash,

and $75,000 par value of the preferred stock of the new
company; that, in March, 1917, Brown, in the name of
Edgar A. Rice, got an option on the Fleming Farm; that,
in February, 1918, he bought the Fleming Farm for
$17,500 cash, and his assuming a mortgage thereon in the
sum of $7,500 and took the deed thereto in the name of
Rice, who was simply a trustee for Brown; Rice, nomi-
nally, sold said land to the new company, for $15,000
cash, $60,000 of mortgage bonds of new company, and
assumption by the new company of said mortgage of
$7,500, all of which consideration received was, by Rice,
at once turned over to Brown, who also, without the
knowledge of his associates, issued to himself $25,000
of the preferred stock of the new company; in the latter
part of 1918, he got in touch with Shideler, and they
formed a conspiracy to cheat and defraud, by organizing
a new company and selling its stock, and having the new
company take over all the stock and assets of the old
company and assume all its debts; he reported this
prospective sale to the directors of the Standard Brick
Company and they submitted the proposition to the
stockholders, which proposal was accepted; he became a
director in the Standard Shale Brick Corporation January,
1921, and served until April 19, 1921; Brown was general
manager of the Standard Shale Brick Corporation, and,
as such, made false reports as to the business and earn-
ings of said company, which reports were used to induce
persons to buy stock of said company; he caused the
lands owned to be placed upon the books at a valuation
of $900,000; he knew that the Standard Brick Company
was insolvent, yet so entered items upon its books as to
make it appear that it had a net surplus of more than
$500,000; of the $100,000 of preferred stock of the
Standard Brick Company, which he obtained, he sold
$33,450 thereof, par value, for cash in that amount, and
the remaining $66,550 he transferred to the Standard

Shale Brick Corporation for an equal amount of its preferred stock, of which he sold $43,500, par value, for cash in that amount; he introduced Sutton and Kimler to Shideler, and was instrumental in getting them employment as stock salesmen; he told Fulwider that the Standard and the Shale company had been consolidated and that the Shale company owned all the property, the plant, the Everson Farm and the Fleming Farm; Brown, Sutton and Kimler took Fulwider to Indianapolis to see Shideler, so that Shideler could talk to Fulwider about the Standard Shale Brick Corporation, and, upon that occasion, he heard Shideler tell Fulwider that the said corporation was paying for everything that was being done, and that it was a paying enterprise, which statement he knew to be false, and knew that it was made for the purpose of deceiving Fulwider and causing him to purchase stock in said company and thereby to defraud him; he also reported, September, 1919, as general manager, to the board of directors of said corporation, that the net profits of said plant for the month of June, 1919 were $4,092.35, for the month of July, 1919, $5,182.14, for the month of August, 1919, $6,077.99, and that he believed the profits for September would exceed either of these months; he also reported, at each the November and December, 1919 meetings of the board of directors of Standard Shale Brick Corporation that profits were being earned, and he recommended that the board declare dividends, both upon its common and preferred stock outstanding, which was, upon the strength of the statements made by him as to business being done and profits being earned, accordingly done.

The material facts found, as they relate to the acts of appellant McGaughey, are, in substance, as follows: He was informed by Edwin M. Brown and Fred W. Shideler that the Standard Brick Company was a going concern, owned about 300 acres of shale lands in Montgomery

County, and was engaged in the manufacture and sale of brick; that it was proposed to organize a new company to take over the plant and business of said company, and he was requested to become one of the incorporators of such new company and a director thereof, to act only temporarily, until such corporation should be fully organized, and then to resign; that McGaughey knew that there was a large demand for shale brick for building purposes and for road construction and that brick of the quality manufactured by the Standard Brick Company commanded high prices; he was told that the stockholders and officers of the Standard Brick Company desired to sell, and that the new company, under a contract of purchase, was to take over the said plant and build a new plant of much larger capacity; "that he had knowledge of the shale brick business and believed with reason that shale brick could be produced in large quantities at the Crawfordsville plant and sold at a large profit"; that McGaughey never had any personal talk or conferences with any of his codefendants in relation to the sale of stock of Standard Shale Brick Corporation; that, prior to the time the Standard Shale Brick Corporation was organized, he was engaged in the business of selling stocks and bonds, and had a desk in the office of Fred W. Shideler, and, under an arrangement with Shideler, he sold certain stocks and bonds for F. W. Shideler and Company upon commission; that, after the organization of Standard Shale Brick Corporation, he sold some of its stock for F. W. Shideler and Company upon a commission basis; that, in lieu of the money earned upon sales made, he accepted, in part, stock in the Standard Shale Brick Corporation, which he kept and held at the time of the trial hereof; that he never met or knew Jacob Fulwider, and had nothing to do with the sale of any stock to him, "*except as such sale may have been influenced by his having helped to organize said Shale*

*Brick Corporation, and his having been a party to the making of said contract with said Standard Brick Company"*; that he "unlawfully and fraudulently assisted, aided and abetted" in the carrying out of the conspiracy of Edwin M. Brown and Fred W. Shideler, by acting as a dummy incorporator and director of said corporation, and by executing said contract of sale with said Standard Brick Company.

The material facts, as they relate to the acts and conduct of appellants Sutton and Kimler, are, in substance, as follows: They were stock salesmen, selling the stock of Standard Shale Brick Corporation for F. W. Shideler and Company; they knew Jacob Fulwider and called upon him at his home a number of times, for the purpose of inducing him to buy said stock; they made statements to him concerning said stock, the value of the plant owned, the business being done, and the earnings of said plant; the statements made were false, were known by Sutton and Kimler, at the time made, to be false; that said statements so made were believed by Fulwider to be true, and relied upon by him and acted upon by him as being true, in his purchasing of said stock; that, in making said statements, they were knowingly assisting Edwin M. Brown and Fred W. Shideler in their fraudulent scheme.

In passing upon the questions presented by this appeal, we must keep in mind the theory upon which the complaint herein was predicated. The part of the complaint needful to be considered in this behalf is as follows: "That at the times herein set out and referred to, the defendants conspired with each other to cheat and defraud divers citizens of the State of Indiana, and the public generally, and especially the plaintiff herein, by and through the organization and incorporation of the Standard Shale Brick Corporation and by placing on the market and selling the preferred and common stock and

bonds of said corporation, and the bonds of the Standard Brick Company, as herein alleged."

Upon the facts found, the court stated as its second conclusion of law that the appellees were entitled to have a judgment in their favor against Edwin Brown, Walter L. Brown, Victor Smock, Chalmers R. McGaughey, Wallace G. Himmelwright, Fred W. Shideler, Emmet J. Sutton and Walter C. Kimler in the sum of $33,902.86 and costs, and a further judgment of $4,500 and costs against Edwin Brown, Fred W. Shideler, Emmit J. Sutton, and Walter C. Kimler. If this conclusion is not well stated, upon the facts found as against the appellants, Walter L. Brown, Victor Smock, and Wallace G. Himmelwright, we need consider only the error assigned by them as to the above conclusion of law.

Before these appellants can be held liable, they must have been either (a) original parties to the said alleged conspiracy or (b) have become parties thereto after it had been formed by others.

There is no finding that these appellants were parties to the original alleged fraudulent conspiracy entered into by and between Edwin Brown and Fred W. Shideler. In fact, the findings tacitly negative such a condition, nor is there any finding that, with knowledge of such conspiracy, they thereafter assisted in furthering the same. Also, there is no finding that Sutton and Kimler, who actually sold the stock in question to Fulwider, were, in so doing, acting as the agents of these said appellants. The findings show, when fairly interpreted, that this group of appellants were holders of stock in, and directors of, the Standard Brick Company; that their business affairs were such that they could no longer give to the business of said company the attention which it demanded, and were, therefore, in a mood to sell their holdings and get out of said corporation. When Edwin Brown suggested the matter of selling to

another corporation all the property, etc., of the Standard Brick Company, the stockholders of said company voted to sell out to such new corporation, and the sale was accordingly consummated. The fact that, when they learned that the new corporation was in straitened circumstances, they thereupon proceeded to collect from it the money due to them under said contract of sale, while it may have hastened the day of a receivership for such purchasing corporation, did not work a fraud upon Jacob Fulwider or any other creditor; these men simply collected what, under the said contract of sale, they were legally entitled to receive, and to be diligent in one's business is not perpetrating a fraud, even though, thereby, other creditors may lose their debts. *Karges Furniture Co.* v. *Amalgamated, etc., Union* (1905), 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788, 6 Ann. Cas. 829. We, therefore, conclude that, as to these said appellants, said conclusion of law is not well stated.

We shall next consider said conclusion as the same affects the appellant Chalmers R. McGaughey. The court expressly found that this appellant had nothing to do with the sale of any of the said stock to Fulwider, and then adds, "except as such sale may have been influenced by his having helped to organize said Shale Brick Corporation and his having been a party to the making of said contract with said Standard Brick Company; that he unlawfully and fraudulently assisted, aided and abetted in the carrying out of the conspiracy of said Edwin M. Brown and Fred W. Shideler by acting as a dummy incorporator and director, and by executing said contract of sale of said Standard Brick Company." It is not found that he had any knowledge of any conspiracy between Edwin Brown and Fred Shideler, nor are any facts found which would charge him with knowledge of such conspiracy or unlaw-

ful purpose at the time he consented to act as one of the incorporators of Standard Shale Brick Corporation, and at the time he signed the contract for the purchase of the property of the Standard Brick Company. Also, there is no finding that Jacob Fulwider, at or before the time he purchased said stock, knew who were the incorporators of the Standard Shale Brick Corporation, or knew who or what parties had signed the contract of sale, or placed any reliance upon or attached any importance whatever to either of said facts. Unless McGaughey had knowledge of the fraudulent purpose of said Brown and Shideler, it is difficult to see how he could have "unlawfully and fraudulently aided and abetted" said conspirators. The above finding as to "aiding" and "abetting" is a mere conclusion, and no facts are found which warrant such conclusion.

In cases of fraud, knowledge and intent are material facts, and, as the presumption of law is that men are honest, and act from laudable rather than from unholy motives, these facts, when either or both are material, must either or both be found. The specific facts as found by the court, to our minds, negative, as to this appellant, both the knowledge and fraudulent intent necessary to make him liable, and we, therefore, conclude that said above-stated conclusion of law is not, as to this appellant, well stated.

The errors assigned by the appellant Edwin M. Brown, and not waived, are those hereinafter considered. We shall first consider the alleged error in overruling his motion for a new trial. Under this specification, he first presents that the decision of the court is not supported by sufficient evidence. In this contention we cannot concur. The specific facts found, as to this appellant, and which are abundantly supported by the evidence, clearly to our minds, impel the conclusion that he and Shideler entered into a conspiracy

to cheat and defraud purchasers of stock in the Standard Shale Brick Corporation. The entire course of conduct concerning these transactions by these parties does not square with honest dealing. The specific acts have been hereinbefore set forth and need not be here repeated. It would be difficult, for instance, to explain why, after the plant, good will, etc., of the Standard Brick Company had been sold to the Standard Shale Brick Corporation at a valuation of $108,337.93, it should, in the literature, etc., sent out by this appellant and Shideler to prospective purchasers of stock, be given a valuation, as being upon the books of the said company, at $900,000. Also, it would be difficult, upon the theory of honesty and fair dealing, to explain his various reports to the board of directors of money earned by said plant, and recommending that dividends be declared, when, in truth and in fact, no profits whatever had been made. Other acts of this appellant in connection with the management of this property and the promotion of the sale of the preferred stock of the Shale Brick Corporation might be cited, but we deem it unnecessary.

It is next presented that the damage assessed is excessive; that the finding as to the damage sustained is not supported by sufficient evidence. The question to be determined by the trial court in this case was: What was the value, if any, of the stock sold to Jacob Fulwider, at the time said stock was sold? The measure of damage sustained by Fulwider was the difference between what he paid for this stock and its fair cash value at the time of purchase, and the question of the solvency of the Standard Shale Brick Corporation, at the time these various sales were made, was, therefore, directly involved. The court found, and the finding is fully supported by the evidence, that the said stock so sold to Fulwider was at all times worthless. We, there-

fore, conclude that there was no error in the findings as to the damage sustained.

This appellant next urges that the giving by Fulwider to John C. Henderson *et al.* of an *option* to purchase his said stock was a waiver of all claims for damage on account of the alleged fraud. The trial court found that Henderson *et al.* went to Fulwider with an offer to purchase his said stock; that, after some negotiating, a contract was prepared which Fulwider understood and believed was a contract under which he was selling his stock to said parties, but which contract he shortly discovered was only an option contract and not a contract of sale, and was, upon discovery, at once repudiated by him. This contract the trial court rightly held was of no force and effect. We need not, therefore, further consider the contention of said appellant in this behalf.

This appellant next contends that the court erred in its conclusions of law No. 2. In this contention we cannot concur. Upon the facts found, as to this appellant, no other conclusion than that of liability against this appellant could have been justly stated.

The appellants Sutton and Kimler first present alleged error as to the said second conclusion of law—that the facts found do not support said conclusion. In this contention we cannot concur. Under the facts found, Edwin Brown and Fred Shideler originated the fraudulent scheme; these appellants knew that the scheme was fraudulent, and with such knowledge they actively assisted therein by themselves making statements which were false, and by giving out prepared literature concerning said corporation, which literature contained statements which they knew were false. They thereby became, with full knowledge of the facts, active participants in the perpetrating of the fraud upon Fulwider, and should be held liable for their acts in that behalf.

It is next urged that the court erred in amending its findings of facts, and in withdrawing and restating its first conclusion of law. The record herein shows that all this was done before the judgment herein appealed from was rendered. It had been repeatedly held that the court may amend its finding, and if necessary, amend and restate a conclusion of law to harmonize therewith, at any time before final judgment is rendered. Such was done in this case, and the court did not err in this matter. *Chicago, etc., R. Co.* v. *Taylor* (1915), 183 Ind. 240, 108 N. E. 1.

These appellants, and appellant Edwin M. Brown, also assign as error, the action of the court in overruling their separate and several motions for a *venire de novo*. This motion was based upon the alleged uncertainness of some of the findings of the court. It is well settled that if the findings of the court, taken as a whole, and considering the issues involved, are so indefinite and uncertain that no valid conclusion of law may be stated thereon, the remedy is by motion for a *venire de novo*. *Brehm* v. *Hennings* (1919), 70 Ind. App. 625, 123 N. E. 821.

Under the authorities, this is the remedy where the verdict, whether general or special, is so indefinite and uncertain that no judgment can be rendered upon it; it lies when the matter is a defect which appears upon the *face* of the record, while the motion for a new trial was intended to reach matters of error not so appearing. Of course, as applied to a special finding, the entire finding, or the finding taken as a whole, is to be considered and not merely the finding as to some particular fact. If there are sufficient valid findings to support the conclusion of law as stated, these conclusions are not vitiated because, perchance, some one or more findings, not necessary to support the conclusion stated, may be indefinite or uncertain. In such case a

470

motion for a *venire de novo* should be overruled. We have already held that, as to these appellants, and as to appellant Edwin Brown, the conclusions were well stated, and we, therefore, conclude that there was no error in overruling the said motion for a *venire de novo*.

We have considered each and all of the alleged errors presented by these appellants and by appellant Edwin M. Brown, and find the contentions of these appellants not well taken thereto.

For the errors above noted, the judgment will be reversed as to the appellants Walter L. Brown, Victor Smock, Wallace G. Himmelwright, and Chalmers R. McGaughey, with directions to restate the second conclusion of law as to said appellants in harmony with this opinion, and to render judgment in their favor accordingly. As to all other appellants, the judgment is affirmed.