VERNON FIRE & CASUALTY INSURANCE COMPANY, GREAT
AMERICAN INSURANCE COMPANY v. A. W. SHARP, D/B/A
COLUMBUS WOOD PRESERVING COMPANY.

[No. 676S181. Filed June 10, 1976. Rehearing denied
September 3, 1976.]

Mark W. Gray, John T. Lorenz, Kightlinger Young Gray & DeTrude, of Indianapolis, William A. Conner, Walker & Conner, of Columbus, Indiana, for appellants.

Charles E. Brown, Crabbe, Brown, Jones, Potts & Schmidt, of Columbus, Ohio, Charles R. Wells, of Columbus, Indiana, for appellee.

HUNTER, J.*—Petitioners, Vernon Fire & Casualty Company and Great American Insurance Company, seek transfer from the decision of the Court of Appeals, 316 N.E.2d 381, affirming the judgment of the trial court in favor of their insured A. W. Sharp, d/b/a Columbus Wood Preserving Company. The judgment awarded compensatory damages based upon petitioners' contracts to indemnify the insured for loss sustained by a fire which gutted his creosoting plant. The judgment also awarded punitive damages based upon the second and third paragraph of Sharp's complaint, infra Part II, generally alleging tortious conduct on behalf of petitioners in dealing with their insured and in refusing to pay over the proceeds of the insurance contracts.

After hearing oral argument, the Court voted to grant transfer and my brother Justice Prentice agreed to prepare the Court's opinion. Upon circulation of the proposed opinion, a majority of the Court concurred with that portion of the opinion which treated the issue of compensatory damages, but disagreed with the disposition of the punitive damages award, requiring another opinion to be written upon that

---

* This case transferred and re-assigned to this office April 7, 1976.

issue. As set forth in Part I, but without quotation marks, the Court now adopts the opinion of Justice Prentice on the issue of compensatory damages.

## I

PRENTICE, J.—Plaintiff (Appellee) was the owner of property destroyed in part and damaged in part by fire. Defendants (Appellants) are two insurance companies, each of which had written a policy (contract) of fire insurance upon the property. The evidence is not in dispute and consisted of stipulation and testimony from the plaintiff and his attorney.

The contracts of insurance had been issued by the same agency, and at the same time. Insofar as is pertinent to this litigation, the contracts were in identical form. The property insured was scheduled in the contracts and of the total value of $125,000.00, but the liability of the insurer under each policy was limited to $31,250.00 or twenty-five percent of the scheduled values.

The insuring agreement of each policy was as follows:

"IN CONSIDERATION OF THE PROVISIONS AND STIPULATIONS HEREIN OR ADDED HERETO AND OF the premium above specified, this Company, for the term of years specified above from inception date shown above at Noon (Standard Time) to expiration date shown above At Noon (Standard Time) at location of property involved, to an amount *not exceeding the amount(s)* above specified, does insure the insured named above and legal representatives, to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace * * *." (Emphasis ours.)

The amount of insurance provided and the property insured was designated in each policy as follows:

*"This policy being for $31,250. covers its pro-rata proportion of and on the following amounts:* (Emphasis ours.)

| | | |
|---|---|---|
| 1. $ 3,000. | | On the one story, iron clad and frame Retort Room. |
| 2. 65,000. 80% | | On contents of the one story, iron clad and frame Retort Room. |

| | | |
|---|---|---|
| 3. | 4,000. | On the concrete block, Creosote Oil Storage Tanks (Limits of Liability) ($1,000. per tank) |
| 4. | 15,000. | On the one story, iron clad and frame Boiler Room and Storage (including boiler and appurtenances) |
| 5. | 1,000. | On the steel Metal Stack. |
| 6. | 35,000. | On contents of Material, principally lumber and ties in yard. |
| 7. | 1,000. 80% | On contents of One story, frame Office building. |
| 8. | 500. | On the one story, frame Laboratory Building. |
| 9. | 500. | On contents of the one story, frame Laboratory Building. |

$125,000  "

The plaintiff's business was under the management of one John Easter, who also had property of his own destroyed in the fire which occurred on June 7, 1971. Mr. Easter's property was not scheduled in the contract, but he filed a claim with the defendants and their agent who had issued the contracts in question.

The plaintiff by his attorney, filed a formal proof of loss with the defendants' adjusting representative upon each contract on August 16, 1971. Such action followed some informal negotiations between the adjuster and the plaintiff personally, the details of which are not disclosed, and from which the plaintiff had concluded that the defendants would refuse to pay his claim until the claim of Mr. Easter was settled. The proofs of loss were on forms provided by the adjuster to the plaintiff's attorney on July 15, 1971. Completed and filed by the plaintiff, each such proof of loss was as follows:

"Total Insurance   THE TOTAL AMOUNT OF INSURANCE upon the property described by this policy was, at the time of the loss, $31,250.00, as more particularly specified in the apportionment attached, besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

| | |
|---|---|
| Value | THE ACTUAL CASH VALUE of said property at the time of the loss was _____ $93,000.00 |
| Loss | THE WHOLE LOSS AND DAMAGE was _____ ___$93,000.00 |
| Amount Claimed | THE AMOUNT CLAIMED under the above numbered policy is __$31,250.00" |

The amount of the plaintiff's loss by reason of the fire was $94,108.09 which was itemized as follows:

| | |
|---|---|
| Retort Room | $ 3,000.00 |
| Retort Room contents 80% | 65,000.00 |
| Creosote Tank | 4,000.00 |
| Boiler | 15,000.00 |
| Materials, Lumber Ties, etc. | 6,108.09 |
| Laboratory Building | 500.00 |
| Laboratory Building contents | 500.00 |
| | $94,108.09 |

From the foregoing, it is readily determined that the plaintiff's loss as to some items was equal to the scheduled value. However, two items insured (a metal stack and office contents) of the total scheduled value of $2,000.00 were not damaged, and only $6,108.09 of the scheduled materials were destroyed or damaged. The plaintiff's losses exceeded the amount of the insurance provided under the two contracts, and under "blanket" policies he would have been entitled to reimbursement for the stated policy limits of $31,250.00 upon each contract. However, these were not "blanket" policies but were "scheduled" policies, i.e. the property insured was separately scheduled and value in the contracts. The liability of the insurers under such policies is limited as to each scheduled item, and a portion applying to one item but unused may not be transferred to another item which was under-valued and thus under-insured.

"A distinction must be made between a policy which speaks in terms of a lump-sum obligation or value of the property and one which separately schedules different items of property. In the latter case, each separately treated item of property is in effect covered by a separate contract of insurance and the amount recoverable with respect to a loss

affecting such property is determined independently of the other items of property." COUCH ON INSURANCE, 2d Ed., § 54.83.

To the same affect, also see CORPUS JURIS SECUNDUM, *Insurance* § 918 and cases there cited.

This distinction was recognized in Indiana in *The Continental Insurance Company* v. *Chew*, (1894) 11 Ind. App. 330, 38 N.E. 417.

In that case, the appellee had been awarded a judgment upon a contract which insured both a house and its contents. The judgment was for less than the total amount of the policy, but the court reversed saying:

"The policy provides for $450 insurance on the house, and $150 on the contents. Thus there was not a general or blanket policy of $600 on both house and contents, but separable contracts for insurance to the amount of $450 on the house, and $150 on the personalty. *Nappanee Furniture Co.* v. *Vernon Ins. Co.,* 10 Ind. App. 319.

"There is also in the policy a provision that the company shall not be liable for an amount beyond the value of the interest of the assured in the property insured.

"It is conceded by counsel for the appellee that she owned but a one-third interest in the realty, and that consequently she was entitled to recover on account of the building, the value of which was $400, only the one-third thereof or $133.33.

"The amount of the recovery was $433.34. Counsel seek to justify this amount upon the theory that appellee is entitled to the full value of the personal property destroyed, which was shown to be $300.

"This position, however, can not be maintained, because she could not in any event recover on account of the loss of the personalty more than the amount of insurance distributed to it in the policy." 11 Ind. App. 330, 333-34.

Where an aggregate amount of insurance is on separately valued items pro rata, the risk as to each item is to be determined by prorating the insurance according to the value of the different items. *E. H. Stanton Co.* v. *Rochester German Underwriters Agency,* D.C. Wash., 206 Fed. 978, *Springfield*

*Fire and Marine Insurance Co.* v. *Simmons,* 184 Okla. 323, 87 P. 2d 941.

The total declared or "scheduled" value of the insured property was $125,000.00 and the amount of coverage under each policy was one-fourth of that value ($ $\frac{31,250.00}{125,000.00}$ or one-fourth), i.e. the ratio of the policy limits to the scheduled value. The prorating of insurance to value applied separately to each scheduled item, the same as would have been the case had the policy limits equaled the total scheduled value. The words "this policy * * * covers its pro rata portion * * *" was a clear expression of the limitation of the defendants' risk to one-fourth of the scheduled values.

The defendants tendered their proposed final instruction No. 1 which, in effect, was a directed verdict in favor of the plaintiff for $23,527.02 against each defendant, such amount being one-fourth of the plaintiff's loss. This instruction was refused.

The trial court erred in its denial of the defendants' tendered instruction No. 1 for the reasons hereinbefore expressed. As a matter of law, the liability of each defendant was limited to $ $\frac{31,250.00}{125,000.00}$ or one-fourth of the scheduled value of each item listed in the contracts of insurance, and the portion of the coverage not utilized by reason of some of the properties having not been damaged was not applicable to increase the amount of coverage upon those items that were lost or damaged but under-insured. The plaintiff was insured under each contract only to the extent of one-fourth of the scheduled or declared value of each item of property scheduled. *Continental Insurance Company* v. *Chew, supra.*

There was no ambiguity in the contract with respect to the defendants' limits of liability. There was confusion from

which the trial court and the Court of Appeals apparently concluded that the defendants sought some relief by reason of the standard "pro rata clauses" found in another section in the insurance contracts, and plaintiff has, by his brief, kept this clause in the foreground. The Court of Appeals correctly stated the law with regard to such clauses, i.e. they do not come into play when the amount of the loss exceeds the face value of the contracts. The purpose of such clauses is to require pro rata contribution from all insurers when there are multiple contracts in effect at the time of the loss. The pro rata clauses were merely inapplicable in this case, but by no stretch of the imagination did they increase the amounts of insurance beyond the scheduled limits expressly provided.

## II

Plaintiff-appellee sought punitive damages against defendants-appellants in the second and third paragraphs of his complaint. The second paragraph alleged:

"That said defendants have wrongfully breached said contracts of insurance and refuse to pay for the loss sustained by the plaintiff, and that said defendants have been guilty of bad faith in dealing with their insured, this plaintiff."

The third paragraph alleged:

"That the said defendants have acted in an intentional and wanton manner in dealing with their insured, this plaintiff, and as a result thereof they have refused to pay this plaintiff the proceeds of said insurance."

At the close of plaintiff's evidence (which was also the close of all evidence), defendants-appellants moved for judgment on the evidence on these paragraphs. The trial court overruled the motion and appellants assign such action as error. There are no mystical considerations confronting a trial court faced with such a motion: the interpretation of Ind. R. Tr. P. 50 consistently has been that the motion must be denied where there is *any* evidence or legitimate inference therefrom tending to support at least

one of the allegations. Where the evidence is such that the minds of reasonable men *might* differ, a directed verdict is improper, and the resolution of conflicting evidence is for the jury. *Mamula* v. *Ford Mtr. Co.*, (1971) 150 Ind. App. 179, 275 N.E.2d 849.

## A. STATEMENT ON THE LAW

The parties to this appeal have briefed the evidentiary question without concern for the legal basis upon which the award of punitive damages may rest. If there be no basis in law for this claim, it cannot matter how much evidence the jury had before it. The general rule, recognized in Indiana, *Hibschman Pontiac, Inc.* v. *Batchelor*, (1976) Ind. App., 340 N.E.2d 377, *Standard Land Corp.* v. *Bogardus*, (1972) 154 Ind. App. 283, 289 N.E.2d 803, and throughout the United States, 11 WILLISTON ON CONTRACTS § 1340 (W. Jaeger, 3d ed. 1968), is that punitive damages are not recoverable in contract actions. In most contract situations, the rule is a fair one, considering the nature of the interest to be protected. As Dean Prosser notes:

> "Contract actions are created to protect the interest in having promises performed. Contract obligations are imposed because of conduct of the parties manifesting consent, and are owed only to the specific individuals named in the contract. Even as to these individuals, the damages recoverable for a breach of the contract duty are limited to those reasonably within the contemplation of the defendant when the contract was made, while in a tort action a much broader measure of damages is applied." Prosser, LAW OF TORTS, 613 (4th ed. 1971).

The well-defined parameters of compensatory and consequential damages which may be assessed against a promisor who decides for whatever reason not to live up to his bargain lend a needed measure of stability and predictability to the free enterprise system. Thus, a promisor's motive for breaching his contract is generally regarded as irrelevant, *Pirchio* v. *Noecker*, (1948) 226 Ind. 622, 82 N.E.2d 838, because the promisee will be compensated for all damages proximately

resulting from the promisor's breach, *Cincinnati & Chi. Air Line R. R.* v. *Rodgers*, (1865) 24 Ind. 103. Where the facts surrounding the promisor's breach indicate sub-standard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, but he is not entitled to mulct the promisor in punitive damages.

The general rule is not ironclad. Exceptions have developed where the conduct of the breaching party not only amounts to a breach of the contract, but also *independently* establishes the elements of a common-law tort such as fraud. *Murphy Auto Sales, Inc.* v. *Coomer*, (1953) 123 Ind. App. 709, 112 N.E.2d 589. The requirement that an *independent* tort be found serves several purposes. First, it maintains the symmetry of the general rule of not allowing punitive damages in contract actions, because the punitive damages are awarded for the *tort*, not on the contract. Secondly, the independent tort requirement facilitates judicial review of the evidence by limiting the scope of review to a search for the elements of the tort. Neither of these functions of the independence requirement is very compelling when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed, but the wrong does not conveniently fit the confines of a pre-determined tort. The foregoing circumstances alone, however, will not sustain the award of punitive damages. *It must also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated.* Only when these factors coalesce, will the independent tort requirement be abrogated, and the allowance of punitive damages be sustained. A careful review of the case law in this area leads to the conclusion expressed herein, that an independent tort need not always be established, and the same conclusion is reached in Corbin's treatise:

> "It can be laid down as a general rule that punitive damages are not recoverable for breach of contract, although in certain classes of cases, there has been a tendency to instruct

the jury that they may award damages in excess of compensation and by way of punishment. These cases, however, are cases that contain elements that enable the court to regard them as falling within the field of tort *or as closely analogous thereto.*" 5 CORBIN ON CONTRACTS § 1077 (1964) [Emphasis added, footnotes omitted].

The standard for awarding punitive damages is necessarily a flexible one. Indiana case law follows Sedgwick's formulation which appears in *Taber* v. *Hutson,* (1854) 5 Ind. 322, 324:

"[W]henever the elements of fraud, malice, gross negligence or oppression *mingle* in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages; in other words, it blends together the interest of society and of the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender." [Emphasis added.]

Sedgwick's recognition that the lines between contract and tort often become blurred is aptly demonstrated by his choice of the word "mingle" in describing the presence of tortious activity which accompanies the breach of contract. This formulation clearly recognizes that an independent tort is not a prerequisite to the recovery of punitive damages, and we adhere to this standard as a wise one.

Appellants acknowledge the foregoing rule allowing punitive damages, but maintain that their conduct in dealing with their insured reflects nothing more than a legitimate exercise of an insurer's "right to disagree" as to the amount of recovery, citing *Meridian Mutual Insurance Co.* v. *McMullen,* (1972) 152 Ind. App. 141, 282 N.E.2d 558. It is evident that the exercise of this right may directly result in the intentional infliction of temporal damage, including the damage of interference with an insured's business (which an insured will undoubtedly consider to be oppressive). The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., the insurer is permitted to dispute its liability in good faith because of

the prohibitive social costs of a rule which would make claims nondisputable. Insurance companies burdened with such liability would either close their doors or increase premium rates to the point where only the rich could afford insurance.

For these reasons, we agree that an insurer cannot be subjected to a punitive damage award for seeking *in good faith* to pay only the amount which the law requires to be paid under its contract. Insofar as defendants' conduct is ascribable to their good faith efforts to pay the legal proceeds, their conduct is privileged.

## B. *STATEMENT ON THE FACTS*

Appellants maintain that the trial court erred in overruling their motion for a directed verdict because there was *no* evidence presented from which the jury could find that appellants were either "guilty of bad faith" or had "acted in an intentional and wanton manner" in dealing with the plaintiff. Since the jury did so find, its verdict must be upheld if there is any evidence presented from which a reasonable jury could conclude that appellants engaged in conduct, not privileged (as that term is used above), which amounted to an independent tort or was tortious in nature.

Plaintiff's evidence and the reasonable inferences therefrom indicate that the defendants knew plaintiff desired to rebuild his business, but could not do so without the insurance proceeds, and that plaintiff continued to incur the expense of a monthly rental of $300 for the plant site in anticipation of rebuilding. While plaintiff was demanding that the insurers were liable for the full face value of the policies of insurance, the record indicates that appellants made no offer to pay plaintiff even that portion of the face value which they deemed him entitled.

The jury also had before it evidence from which it could reasonably infer that the defendants sought to use their knowledge of plaintiff's desperate need for funds for reconstruction to require plaintiff to procure a settlement of a

separate lawsuit brought by plaintiff's manager, John L. Easter, against the defendants for negligent failure to issue a fire insurance policy on Easter's property which was consumed in the blaze. From such evidence the jury could reasonably infer that the defendants had refused, and would continue to refuse, to pay the plaintiff *even the amount which the insurance companies concede he was entitled to,* until the plaintiff obtained a release of Easter's claim. That evidence is as follows:

(a) *Plaintiff's Exhibit 4, letter from plaintiff's attorney Leon D. Cline to Mr. J. P. Heffernan, Branch Manager of the General Adjustment Bureau, Inc., dated June 30, 1971.* "Dear Mr. Heffernan:

"This is to confirm our telephone conversation of yesterday afternoon relative to the recent fire loss of our client, Mr. A. W. Sharp, d/b/a Columbus Wood Preserving Co.

"Mr. Sharp is most desirous of getting this matter settled promptly and without further delay because of pressing financial matters arising from the loss of his business here in Columbus, Indiana. Consequently, we ask that you submit to my office proof of loss forms and any other forms necessary to get this matter adjusted without further delay.

"In our conversation *you mentioned a lawsuit which had been filed by Mr. Sharp's Plant Manager, Mr. John Easter, and the insurance companies' wishes to hold up on Mr. Sharp's fire claim until Mr. Easter's suit had been settled.* This, of course, is impossible. . . ."

(b) *Direct examination of Leon D. Cline, attorney for plaintiff.*

PRELIMINARY QUESTION—Mr. Gray

Q. "Are the conversations you are about to relate sir, before or after you filed suit?"

A. "Before."

MR. GRAY: "All right, go ahead."

A. "On August 27, 1971, following this last letter, I got a call, it was from an adjuster, and it was either Mr. Hefferman [sic] or Mr. Dyer. Want me to relate?"

Q. "Yes, would you? Relate the conversation."

OBJECTION—Mr. Conner: "We renew our original objection, Your Honor."

JUDGE: "You may note the same objection heretofore made by counsel, and the Court overrules said objection. You may answer."

A. "The sum and substance of the conversation by this adjuster was that Mr. Easter's claim, or, sorry, Mr. Sharp's claim was not going to be disposed of until they had handled or got the suit settled with Mr. Easter."

\* \* \*

Q. "Now I'll ask you, Mr. Cline, at any time during your negotiations, and so forth, in your representation of Mr. Sharp, did the insurance company at any time offer to settle his claim *for any amount* during the period of time you represented him?"

A. "No, they —"

OBJECTION—Mr. Gray: "To which we will object by reason of the fact that any offer or negotiation of settlement after suit was filed would not be germane, would not be admissible."

JUDGE: "You may note that the question is overruled. You may answer that question."

A. "At no time did they make any offer to settle."

(c) *Direct examination of Amor Sharp, plaintiff.*

Q. "Why was a lawsuit filed?"

OBJECTION—Mr. Gray: "Now if the Court please, this is a self-serving declaration and calls for an answer which is not germane to the issues."

JUDGE: "You may note that the objection is overruled. And you may answer."

A. "The reason the suit was filed was because I couldn't collect otherwise."

\* \* \*

Q. "To your personal knowledge, not talking about any knowledge your lawyer might have, to your personal knowledge, did these insurance companies, or did any of their representatives ever tell you why they didn't pay you?"

A. "Yes, sir."

Q. "What did they tell you?"

A. "Because of a counterclaim that John Easter had filed against my policies."

Q. "Did John Easter own or have any interest in any of the matters under which you are making your claim?"

A. "No, sir. It was a ficticious [sic] claim."

Q. "Had you always carried insurance with —, not always, but for some years carried insurance with these two companies?"

A. "Yes, sir."

Q. "They knew who you were?"

A. "Yes, sir."

Q. "Did anyone else own or have an interest in the Columbus Wood Preserving Company?"

A. "No, sir."

Q. "Whatever interest Mr. Easter might have had in anything would have been confined to what, sir?"

A. "Why it would have been confined to treating fluids of machines that he bought to help him in the operation of the —"

Q. "I think he bought a forklift."

A. "A forklift, he bought a tractor."

Q. "Did you make any kind of a claim for anything that Mr. Easter owned?"

A. "No, sir."

Q. "And did these fire insurance companies ever dispute the fact that you owned the things that you claim that you owned?"

A. "No, sir."

(d) *Plaintiff's Exhibit 9, letter from attorney for defendants to the plaintiff, dated October 6, 1971.*

"Dear Mr. Sharp:

"We returned herewith the Proofs of Loss which you filed August 12th, 1971, with the Great American Insurance Company of New York and the Vernon Fire and Casualty Company of Indianapolis.

"Both Companies find it necessary to reject these Proofs of Loss for the following reasons:

"(a) The amount claimed is in excess of the loss reflected in your sworn statement.

"(b) Contrary claims against these policies have been filed by your manager and contracting party, John L. Easter.

"If you can provide us with Proofs of Loss in the correct amount *and can provide us with release of any claims by John L. Easter against these two Companies,* I believe the Companies would be willing to make payment at an early date for the actual loss suffered under the coverage of these two policies." [Emphases added.]

The insurance contracts were in evidence, and both contained identical "Requirements in Case Loss Occurs" clauses. These clauses are exceedingly detailed, but they do not purport to require the plaintiff to settle the lawsuits of other parties arising from the occurrence which produce plaintiff's loss, and no reasonable juror could find that the clauses contained such a requirement.

## C. *APPLICATION OF LAW*

At the outset, we note that the second and third paragraphs of plaintiff's complaint do not charge appellants with the commission of an independent tort. In view of the foregoing evidence, however, we believe the jury could have reasonably found that the appellants promised to pay the legal proceeds of the policies in accordance with the terms thereof, that appellants knew such representation to be false, in that the policy did not contain all preconditions to payment, that plaintiff relied upon this representation by continuing to carry his insurance with appellants and by not insuring his property through another carrier, and that plaintiff was damaged by this reliance. Viewed in this manner, plaintiff's evidence establishes the elements of fraud, *Edwards* v. *Hudson,* (1938) 214 Ind. 120, 14 N.E.2d 705, and any inconsistency between plaintiff's pleading and proof will be resolved in favor of the proof at trial, *Ayr-Way Stores, Inc.* v. *Chitwood,* (1973) 261 Ind. 86, 300 N.E.2d 335.

Plaintiff's second paragraph charged appellants with wrongfully breaching their contracts by refusing to pay his loss. Plaintiff embellished his claim by charging "that said defendants have been guilty of bad faith in dealing with their insured." As noted above, appellants are not subject to punitive

damages insofar as their actions are attributable to their good-faith efforts to pay the legal proceeds. Consequently, the evidence herein dictates that appellants' actions which ultimately required plaintiff to seek judicial determination of the amount of appellants' liability under the contracts of insurance were in good faith, since there was no evidence to indicate that the policies were reasonably susceptible of only one interpretation and that being in favor of the plaintiff. We therefore hold that the trial court erred in denying appellants' motion for a directed verdict on the second paragraph of plaintiff's complaint.

Plaintiff's third paragraph charged that appellants acted in an intentional and wanton manner in refusing to pay plaintiff the proceeds of the policies. From the evidence herein the jury could reasonably conclude that appellants acted in an "intentional and wanton" manner in dealing with plaintiff in regard to securing a settlement of Mr. Easter's claim, and since this conduct did not relate solely to the appellants' actions in paying the legal proceeds, it was not privileged. We believe such conduct might also have been characterized as "oppressive" as that term is used in *Murphy Auto Sales, supra.* Black's Law Dictionary defines oppression as: "An act of cruelty, severity, unlawful exaction, or excessive use of authority." Plaintiff's evidence showed that the insurers dealt with his claim with an "interested motive" and wrongfully attempted by virtue of their superior position to exact additional consideration from the plaintiff before performing their obligations under the contract. This evidence was sufficient to establish a serious intentional wrong.

As noted above, punitive damages "do not rest upon any ground of abstract or theoretical justice but upon the basis of an established public policy which seeks to promote the public safety." *Murphy Auto Sales, supra.* The public policy of the state is to be determined from a consideration of our constitution, statutes, the practice of governmental officers in the course of administration and

the decisions of our courts. *Hogston* v. *Bell*, (1916) 185 Ind. 536, 112 N.E. 883. From an examination of Title 22 of the Indiana Code, we find expressed therein a public policy to regulate those engaging in the insurance business in this state, not only for the good of the public, but for the benefit of insurers as well. One area regulated by this title is insurance company rate-making. IND. CODE § 27-1-22-1, *et seq.*, (Burns 1975). An insurance company, like any other business, is entitled to a reasonable return on its investment. To guarantee such a return, the company demands a premium which will offset its cost of doing business and which will enable the company to meet its obligations as they become due. One of the costs of engaging in the insurance business, and allowable under the statute, is the settling of spurious claims, such as that of plaintiff's manager. When such rates have been determined in accordance with the statutory scheme, IND. CODE § 27-1-22-18 (Burns 1975) prohibits insurers from altering the rates by knowingly charging, *demanding* or receiving a premium which is in excess of those established by law. Appellants' actions in demanding non-contractual settlement service from their insured as a pre-condition to paying the loss they were already obligated to pay under the contract offend the statutes governing the rate-making process. If appellants' demands had been met, it is clear that appellants would have reaped an unbargained-for benefit from the insured, which would have operated to increase the value of the premium paid by the insured. This type of behavior ignores the rights of the individual insured and undercuts the rights of insurers who abide by the rate-making laws.

When a statutory scheme exists to protect the public, those who are regulated thereby may not act in an intentional and wrongful manner so as to defeat the statutory objective, see *Frampton* v. *Central Indiana Gas Co.*, (1973) 260 Ind. 249, 297 N.E.2d 425. We conclude that the public policy of this state permits the recovery of

punitive damages under the circumstances of this case. There was evidence presented under the third paragraph of plaintiff's complaint from which the jury could reasonably find that appellants acted tortiously in dealing with the plaintiff. The trial court did not err in overruling appellants' motion for a directed verdict on plaintiff's third paragraph.

Judgment for plaintiff awarding compensatory damages of $31,250 against each defendant is hereby reversed and the cause is remanded to the trial court with instructions to vacate the judgment and enter final judgment for the plaintiff in the amount of $23,527.02 against each defendant, with interest from the date of entry. The judgment of the trial court in all other matters, including the award of punitive damages of $17,000 against each defendant, is hereby affirmed.

Givan, C.J., and Arterburn, J., concur; Prentice, J., dissents with opinion in which DeBruler, J., concurs.

### DISSENTING OPINION

PRENTICE, J.—I disagree with the majority opinion upon the issue of punitive damages, and I am unable to ascertain the basis upon which it has upheld the allowance in this case. It appears that it is saying that such damages may be awarded for breach of contract without a showing of tortious conduct but, that in this case, there was evidence of an independent tort, i.e. fraud in the inducement. I dispute both premises.

I further dispute that there was probative evidence presented from which the jury could reasonably find that the defendants were guilty of "bad faith," or acted in an "intentional and wanton manner," which of course also disputes that the defendants committed a fraud upon the plaintiff. The conclusion to the contrary, can be drawn only by accepting the opinions of the plaintiff and his counsel as probative evidence. Notwithstanding that such opinions found their way into the evidence, they were not probative, and they were therefore not entitled to be weighed as such. Without

them the record is devoid of any evidence of improper acts or omissions by the defendants.

There are additional reasons in law why the allowance of punitive damages in this case was improper, and I shall touch upon these briefly later in this opinion.

When I voted to grant transfer and undertook to write what I then assumed would be the opinion for the majority, my intention was to correct the error of the trial court and the Court of Appeals upon the issue of compensatory damages. It was my opinion at that time, however, that if the record revealed evidence from which the jury could reasonably find that the defendants had acted in bad faith in their settlement negotiations with the plaintiff, the judgment upon the issue of punitive damages should stand. My subsequent research revealed that this was an erroneous concept as will be hereinafter revealed. Prior to reaching that point, however, I discovered from repeated and careful readings of the entire bill of exceptions that there was no evidence of probative value from which bad faith or wantonness could reasonably be inferred. The denial of such evidence is here intended to negate also any reasonable inference of "elements of fraud," "serious intentional wrong," conduct "characterized as 'oppressive,' " conduct violative of a "public policy," any act of "cruelty, severity, unlawful exaction, or excessive use of authority," or "any tortious dealings," such terms having been variously employed throughout the majority opinion.

I neither disparage nor ignore the rule that prohibits this Court from reversing a trial court judgment upon the weight of the evidence. It is a rule of long standing and for the most part serves the cause of justice well, although it has not always been the rule and is not infallible. *The Toledo and Wabash Railway Co.* v. *Goddard,* (1865) 25 Ind. 185; *Martin* v. *State,* (1867) 28 Ind. 310; *Batterson* v. *State,* (1878) 63 Ind. 531; *The Jeffersonville, etc. R. R. Co.* v. *Bowen,* (1874) 49 Ind. 154. The rule, however, requires facts found

and inferences drawn to be reasonable and to be found and drawn from probative evidence. If they are not, it is the right and the duty of this Court to disregard them. And in making the determination of reasonableness the evidence must be viewed in context. *Tom* v. *State,* (1973) 261 Ind. 295, 302 N.E.2d 494. Bits and pieces of evidence may not be isolated out of context and each given its most devastating force, which is but another way of saying that evidence that merely tends to support or to establish suspicion is not sufficient, *Baker* v. *State,* (1956) 236 Ind. 55, 138 N.E.2d 641, or that there must be more than a mere scintilla of evidence. *Gipe* v. *Pittsburgh, etc. R. Co.,* (1907) 41 Ind. App. 156, 82 N.E. 471; *Richey, etc.* v. *Sheaks,* (1967) 141 Ind. App. 423, 228 N.E.2d 429.

## FACTS RESTATED

Under the heading of "Statement on the Facts" the majority opinion recites the evidence which it maintains supports its decision—not merely a portion adequate to illustrate its sufficiency, but essentially all of it. None of the evidence was in dispute, and all of it came from the plaintiff and his lawyer. Notwithstanding that it will be, to some extent, repetitious, I find it necessary to recite here all of the relevant evidence adduced at the trial, not because it refutes that recited by the majority but because that omitted is contextual. Additionally, a full recital will avert the supposition that what was not recited by the majority was supportive of its conclusions. For example, the majority opinion recites that it was reasonably inferable that the defendant sought to use its knowledge of plaintiff's "desperate need for funds." There is no evidence that the plaintiff had a "desperate" or even urgent need for funds. The testimony was that he desired to rebuild his investment property that had been destroyed but would be unable to do so until the insurance proceeds were paid. Such circumstances, to my mind, do not reflect desperation. If I am wrong, the use to which the plaintiff intended to apply the contract proceeds was, nevertheless, immaterial, as will

be later shown. *Clark* v. *Life & Casualty Insurance Co.*, (1932) 245 Ky. 579, 53 S.W.2d 968; *Haas* v. *Pacific Mutual Life Insurance Co. of California, et al.*, (1941) 70 Ohio App. 332, 41 N.E.2d 263.

The majority opinion recites that the defendants knew, at the time the contracts of insurance were purchased that such contracts did not contain all pre-conditions to payment. There simply is no evidence to support such a finding. The majority opinion also charges that the defendants demanded "Non-contractual" settlement services from the plaintiff, and there is no probative evidence in support of that charge.

Plaintiff had two policies of fire insurance, one with each defendant, each being for a maximum of $31,250.00. These policies were scheduled, i.e. each policy insured each scheduled article for a maximum one-fourth of its scheduled value. Plaintiff had a fire loss on June 7, 1971 to the extent of $94,108.09. Some property scheduled was not lost or damaged, but other property lost or damaged was either of a value greater than that scheduled or was not scheduled at all. This Court has agreed, as a matter of law, that the plaintiff's insured loss was a total of $47,054.04 or $23,527.02 under each policy.

Plaintiff's business, where the fire occurred, was upon leased land and was, at that time, under the management of one John Easter. Easter also lost property in the fire, which appears to have been uninsured. He claimed, however, that the same insurance agent that had handled the Sharp insurance had agreed to include his property in the plaintiff's insurance, and he filed suit against the agent and the two insurance companies that are the defendants in this cause. We are not privy to the details of such claim, but from the trial judge's order denying the defendant's motion to interplead Easter in this case, I conclude that Easter's claim was not made under the policies with which we are here concerned.

Following the fire, verbal negotiations between the plaintiff and the defendants' adjuster took place. The record does not

reveal any of the details of such negotiations, but it is clear that the plaintiff demanded not the amount of his insured loss but the policy limits of $31,250.00 from each defendant. It is also clear that the defendants did not deny liability and that the plaintiff concluded, from his negotiations with the adjuster, that the defendants were being arbitrary and would refuse to pay his claim and that, for that reason, he turned the matter over to legal counsel on or about June 21, 1971.

Excerpt from direct testimony of Plaintiff:

"Q. All right, sir, after the fire, after the loss, did you attempt to collect from the Vernon Fire and Casualty Insurance Company and the Great American Insurance Company the amount of your loss?

"A. Yes, sir.

"Q. And what was the total amount of the loss, that is, the total amount of the loss that you had in the fire?

"A. Ninety-four thousand dollars ($94,000.00) plus.

"Q. And what was the face amount of each policy that you had with Vernon Fire and Casualty Insurance Company and Great American Insurance Company?

"A. Thirty-one thousand two hundred and fifty dollars ($31,250.00).

"Q. Did you make a demand upon each of those companies to pay that mount of money?

"A. Yes, sir.

"Q. Did they ever pay that amount of money?

"A. No, sir.

"Q. Did they ever deny to you that you did, in fact, have an insurance policy in full force and effect with them?

"A. No, sir.

"Q. In that amount. And as we know, you did obtain counsel here in Columbus, Indiana?

"A. Yes, sir.

"Q. Namely, Mr. Cline, and ultimately a lawsuit was filed?

"A. Yes, sir.

"Q. Why was a lawsuit filed?

OBJECTION—Mr. Gray

"Now if the Court please, this is a self-serving declaration and calls for an answer which is not germane to the issues.

JUDGE:
"You may note that the objection is overruled. And you may answer.
"A. The reason the suit was filed was because I couldn't collect otherwise."

The plaintiff's attorney contacted the adjuster on the following day. On June 29th, the adjuster verbally advised the attorney that his companies did not want to settle the matter until the Easter claim was resolved. On June 30th, the attorney wrote to the adjuster and advised that such a delay in settlement was not satisfactory, and he requested forms for making the proof of loss.

"General Adjustment Bureau, Inc.
606 Franklin Street
P. O. Box 527
Columbus, Indiana 47201
"Attention: Mr. J. P. Heffernan,
            Branch Manager
            Re: A. W. Sharp, d/b/a Columbus
                Wood Preserving Co.
                Fire Loss—June 7, 1971

"Dear Mr. Heffernan:
"This is to confirm our telephone conversation of yesterday afternoon relative to the recent fire loss of our client, Mr. A. W. Sharp, d/b/a Columbus Wood Preserving Co.

"Mr. Sharp is most desirous of getting this matter settled promptly and without further delay because of pressing financial matters arising from the loss of his business here in Columbus, Indiana. Consequently, we ask that you submit to my office proof of loss forms and any other forms necessary to get this matter adjusted without further delay.

"In our conversation you mentioned a lawsuit which had been filed by Mr. Sharp's Plant Manager, Mr. John Easter, and the insurance companies' wishes to hold up on Mr. Sharp's fire claim until Mr. Easter's suit had been settled. This, of course, is impossible and if settlement cannot be made within the next few days, we will be forced to file an action for Mr. Sharp on his policies of insurance. As such, we ask that you inform us of what course of action the insurance companies intend to make in adjusting and settling Mr. Sharp's fire loss.

"Very truly yours,
"Leon D. Cline

"LDC:ewm
"CC: Mr. A. W. Sharp
   Columbus Wood Preserving Co.
   518 East Town Street
   Columbus, Ohio 43215"

On July 15th, the proof of loss forms were mailed to the attorney. On August 16th, proof of loss was submitted by the attorneys and reflected a loss of $93,000.00 and the claim for the face amount of the policies—$31,250.00 each, rather than for $23,527.02 actually owing under each policy. This was accompanied with a request for early payment and an expression of the plaintiff's need for the insurance proceeds.

"August 16, 1971

"General Adjustment Bureau, Inc.
2421 Willowbrook Parkway
P. O. Box 55507
Indianapolis, Ind. 46205
"Attention: Mr. C. F. Dyer

    General Adjuster
    Re: A. W. Sharp, d/b/a Columbus
     Wood Preserving Co.
     v. Great American Insurance Co., et al.
     Our File No. 71-341
     Your File—Columbus Wood Preserving
     Co. Fire 6-7-71, Columbus, Indiana

"Dear Mr. Dyer:
"Enclosed are Proof of Loss forms properly executed by our client, Mr. A. W. Sharp, d/b/a Columbus Wood Preserving Co., in accordance with the instructions contained in your letter dated July 15, 1971. You will note that one of these Proof of Loss forms goes to Great American Insurance Company and the other to Vernon Fire and Casualty Insurance Company.

"We request that you advise us by return mail when our client can expect payment for this loss. Mr. Sharp is in the process of making plans to reestablish his plant, but it is necessary that he have the insurance proceeds available to him before moving ahead. Consequently, we must ask you to expedite this matter without further delay.

     "Very truly yours,
     "Leon D. Cline"

On August 27th, the adjuster and the attorney conferred, and the attorney was advised that the claim would not be paid until the Easter claim was resolved. *Excerpt from direct testimony of Mr. Cline, one of the attorneys for the plaintiff:*

"A. The sum and substance of the conversation by this adjuster was that Mr. Easter's claim, or, sorry, Mr. Sharp's claim was not going to be disposed of until they had handled or got the suit settled with Mr. Easter.

"Q. And then what occurred, if anything?

"A. Well, following that, then I filed suit for and on behalf of Mr. Sharp around the first of September.

"Q. And this is the suit or complaint we are hearing now?

"A. Right, the suit the jury is hearing now."

On September 2nd, a complaint in three paragraphs was filed. Paragraph one was a complaint for breach of the insurance contracts and set damages of $31,250.00 against each defendant. Paragraph two of the complaint was a repeat of paragraph one, with the additional allegation that the defendants had breached said contracts in bad faith. It asked damages for $31,250.00 and punitive damages of $50,000.00 against each defendant.

Paragraph three of the complaint was a repeat of paragraph one and additionally alleged that the defendants had acted "in an intentional and wanton manner in dealing with their insured." It set compensatory damages of $31,250.00 and punitive damages of $50,000.00 against each defendant.

The following letters followed the aforementioned August 27th conference between plaintiff's attorney and defendants' adjuster, notwithstanding that the complaint had been filed in the interim:

"Mr. A. W. Sharp
d/b/a Columbus Wood Preserving Company
c/o Mr. Leon D. Cline
Goltra, Cline; King & Beck
1015 Third Street, Box 250
Columbus, Indiana 47201

RE: A. W. Sharp, d/b/a Columbus Wood
Preserving Company
Vernon Fire and Casualty Ins. Co.
Great American Ins. Co.
Our File No. 11-413A

"Dear Mr. Sharp:

"We return herewith the Proofs of Loss which you filed August 12th, 1971, with the Great American Insurance Company of New York and the Vernon Fire and Casualty Company of Indianapolis.

"Both Companies find it necessary to reject these Proofs of Loss for the following reasons:

"(a) The amount claimed is in excess of the loss reflected in your sworn statement.

"(b) Contrary claims against these policies have been filed by your manager and contracting party, John L. Easter.

"If you can provide us with Proofs of Loss in the correct amount and can provide us with release of any claims by John L. Easter against these two Companies, I believe the Companies would be willing to make payment at an early date for the actual loss suffered under the coverage of either of these two policies.

"We will await your further attention.

"Very truly yours,
"Kightlinger Young Gray & Hudson
"/s/ Mark W. Gray
"Mark W. Gray

"MWG/ep

"Enclosures—Proofs of Loss"

"October 8, 1971

"Kightlinger, Young, Gray & Hudson
Attorneys at Law
Sixth Floor First Federal Bldg.
11 North Pennsylvania Street
Indianapolis, Ind. 46204

"Attention: Mr. Mark W. Gray

Re: A. W. Sharp, d/b/a Columbus Wood
Preserving Company
Vernon Fire and Casualty Ins. Co.
Great American Ins. Co.
Your File No. 11-413a
Our File No. 71-341

"Dear Mr. Gray:

"I find it hard to believe that you could be the author of the letter dated October 6, 1971 on your firm's stationery and bearing your signature. ·

"It has been over four months since the occurrence of the fire which completely obliterated Mr. Sharp's wood preserving business and the two insurance companies you represent still have not come forward to offer Mr. Sharp any money whatsoever for his fire loss.

"Your statement that the insurance companies will not pay anything because they think 'the amount claimed is in excess of the loss reflected in your (Mr. Sharp's) sworn statement' is absolutely ridiculous. This situation could be remedied rather quickly if the two companies would pay the loss which is reflected in Mr. Sharp's sworn statement.

"Your further statement that Mr. Easter has filed a contrary claim on these policies is extremely difficult to understand. As you and your clients well know, Mr. Easter is making no claim on the retorts (completely destroyed), or the storage tanks (completely destroyed), or the new boiler (completely destroyed), or the ties (which were completely destroyed), etc. Such statement on behalf of your clients is nothing more than a feeble excuse for their arbitrary and malicious position in refusing to pay Mr. Sharp's claim or even to make a good faith attempt to negotiate a settlement with him. The statement contained in the last paragraph of your letter that Mr. Sharp's loss will be paid 'at an early date after he gets you a release from Mr. Easter' is a blatant attempt on the part of the insurance companies to pressure Mr. Sharp to get Mr. Easter's pending lawsuit against them settled. As you and your clients well know, there is no requirement in these policies that Mr. Sharp furnish the insurance companies with a release from Mr. Easter or anyone else.

"Very truly yours,
"Leon D. Cline"

At no time did the defendants offer to pay any specified sum to the plaintiff. Although it did, on several occasions indicate a willingness to pay the proper amount, it was in each instance conditioned upon the Easter claim also being resolved. Neither did the plaintiff ever reduce its demand to the amount actually owing under the policy.

The plaintiff continued to pay rent at the rate of $300.00

per month upon the business site but was unable to rebuild the plant because of his inability to collect the insurance proceeds.

## CONCLUSIONS OF FACT AND DISCUSSION OF LAW

It is, in my opinion, unreasonable to infer from the foregoing evidence that the defendants either breached the contract in "bad faith" or "acted in an intentional and wanton manner * * *," or did any of the other nefarious deeds attributed to it by the majority opinion. A contrary inference can be drawn only from the defendants' unwillingness to pay the plaintiff's claim until the claim of John Easter was also resolved. In this regard, the defendants may have been wrong—the trial court thought that they were, hence it denied the defendants' motions, first to consolidate the two lawsuits and second to inter-plead Easter in the lawsuit with the plaintiff. But, may not one be mistaken without being in bad faith, wanton, or otherwise evil? Did not the defendants have a right to consider the possibility of paying the wrong person or wrong amount to one of two claimants and accordingly to seek releases or a court sanction before paying out their money?

The defendants' actions, although they may be consistent with an evil design were, nevertheless, not in any way inconsistent with bona fide intentions; and this is not altered by a subsequent court determination that their ultimate goal was not tenable. It is presumed in law that all persons act honestly and in good faith. *Sutton* v. *Bunnell,* (1929) 91 Ind. App. 427, 167 N.E. 731; and where facts are equally consistent with honesty or dishonesty and fraud, the presumption of honesty will prevail. *American Varnish Co.* v. *Reed,* (1899) 154 Ind. 88, 55 N.E. 224.

The findings of bad faith, etc. therefore has simply not been proved by a preponderance of the evidence and can be sustained only by invoking a presumption of such and then

supporting with a mere scintilla of evidence. To say that the defendants' actions were not in good faith or were wanton is to say that reasonable minds may not differ and that one whose judgment ultimately turns out to be incorrect was unreasonable and in bad faith from the beginning. Our entire system of civil jurisprudence is diametrically opposed to this concept.

## TORTIOUS CONDUCT—INDEPENDENT TORT

If I am incorrect in the foregoing and the defendants were, in fact, guilty of wrongdoing the next issue to be resolved is whether or not their conduct was tortious.

Although an over-simplification, for purposes of this analysis we may take the rudimentary definition of a tort as a wrong, other than a breach of contract, for which a civil action for damages will lie; a breach of duty which the law, as distinguished from a mere contract, has imposed. "An act or omission may be wrong in morals, or it may be wrong in law. It is scarcely necessary to say that the two things are not interchangeable." Cooley on Torts, § 3, (4th Ed. 1932). In some instances, an action for a breach of contract or for a tort may be brought by the same person upon the same facts, but the rule generally is that where contract relations exist the parties assume towards each other no duties whatsoever other than those contracted for. Cooley on Torts, § 60, (4th Ed. 1932).

The majority concedes that punitive damages are not generally allowable in contract actions but notes an exception in cases where the breach also constituted or embodied an independent tort. Under such circumstances, punitive damages may be awarded, not for the breach but for the tort. The majority then departs momentarily from this point—why, I do not understand—to comment that an independent tort is not a prerequisite. It then returns to the matter at hand and proceeds to a determination that the evidence in this case warranted a finding that the defendant did, in fact,

commit an independent tort upon the plaintiff, to-wit, fraud. I shall here challenge that conclusion and respond to the digression subsequently.

Obviously, fraud in the breach of the contract is not supportable, because one of the requisites of a fraud, to be actionable as a tort, is that the complaining party relied upon the perpetrator's representations and acted upon them to his detriment. If the plaintiff did, in fact, believe that the defendants were attempting to coerce him into obtaining a release from Easter—a position clearly not supported by the evidence—he, nevertheless, did not act upon it or alter his position in the slightest. His position thereafter was no different than it was before. He still had a right to collect the amount of his insured loss, which he promptly demonstrated by filing suit.

I say that the claim that the defendants were attempting to coerce the plaintiff into obtaining a release from Easter is not supported by the evidence. A careful reading of the evidence will disclose that the defendants never demanded or even requested such action by the plaintiff. They did make it clear that they would not pay the claim until the Easter claim was resolved, thus leaving that course of action open to the plaintiff if he so desired. The October 6th letter from the defendants' counsel to plaintiff's counsel might well be regarded as a suggestion that the plaintiff might expedite matters by assisting with the Easter problem but nothing more. I see no impropriety in that. The only inference of impropriety comes from the plaintiff's counsel. In his letter of October 8th, he wrote: "The statement contained in the last paragraph of your letter that Mr. Sharp's loss will be paid 'at an early date after he gets you a release from Mr. Easter' is a blatant attempt on the part of the insurance companies to pressure Mr. Sharp to get Mr. Easter's pending lawsuit against them settled. As you and your clients well know, there is no requirement in these policies that Mr. Sharp furnish the insurance companies with a release from

Mr. Easter or any one else." The letter to which defense counsel's letter replied contained no such statement. The statement which had been made was in evidence and spoke for itself. It cannot be ignored and replaced by the defense counsel's interpretation of it under the guise of conflicting evidence that cannot be reweighed by this Court.

By his March 3, 1972 letter, plaintiff's counsel accused the defendants of attempting "* * * to involve him in the matter and 'blackjack' him into giving up some benefits of his policies in order to help your clients effect a settlement with Easter." This evidence simply recited the professed opinion of plaintiff's counsel. It was not evidence of any of the defendants' statements or actions, and it came in response to a letter from the defense counsel assuring their willingness to negotiate and settle the matter if they could be secure against duplicate losses.

Again, by his letter of April 13th, the plaintiff's lawyer accused the defendants of foul play. And again, this was merely an accusation and not probative evidence. It was made in response to an announcement of the filing for interpleader to include Easter in the litigation and an explanation of the purpose thereof, which may have been wrong but certainly was not unreasonable. Tortious conduct not being embodied in the alleged breach, that is the defendants' refusal to pay the plaintiff's claim, the majority turned to "fraud in the inducement." This claim was never made by the plaintiff, but admittedly it would support the judgment under *Ayr-Way Stores, Inc. et al.* v. *Chitwood*, (1973) 261 Ind. 86, 300 N.E.2d 335, but for the absence of probative evidence. The majority opinion states that the jury could have reasonably found that the defendants promised to perform upon the conditions stated in the contract and that the plaintiff relied upon such representation. Obviously this is the case. In other words, the parties entered into a contract! The majority also states, however, that the jury could have reasonably found that at the time the contracts were induced,

the defendants had no intention of performing their obligations thereunder. I recognize that fraud usually must be proved by circumstantial evidence. One with fraudulent intentions is not likely to announce them, and their existence at a prior time may be evidenced by subsequent actions that are inconsistent with bona fide intentions. To say, however, that the failure to perform, coupled with a stated reason for not performing and subsequently determined to be erroneous evidences a fraudulent intent from the beginning, can only be categorized as ludicrous. Under such a determination, I can conceive of no contract default that would not evidence fraud in the inducement, with the possible exception of one where the defaulter either stood mute or stated that he would not perform and would not say why. But surely a court that would find fraud in the inducement upon the evidence in this case would also be bound to say that such an onerous attitude was "wanton," "oppressive," and "a serious intentional wrong," reasonably supportive of a determination that the nonperforming party had a black heart from the beginning. The implications of this decision are far reaching and devastating. A few hypothetical situations quickly come to mind.

The insured in this case erroneously claimed benefits considerably in excess of those to which he was entitled. This has now been determined as a matter of law. His lawyer badgered the defendants for payment and called the defendants' contentions that the claim was excessive "absolutely ridiculous." Yet we have determined that the defendants' position not only was not absolutely ridiculous but was, in law, absolutely correct. Was the plaintiff fraudulent in making his claim? His excessive claim is consistent with that hypothesis. It is equally consistent with the hypothesis of honest error, and he is entitled to that presumption. Under the majority view, however, the defendants could have voided the policies under the claim that the plaintiff, at the time he purchased the policies, intended to make excessive claims —fraudulently induced the defendants to issue their contracts.

Assume a bank returned a depositor's check for insufficient funds but that the depositor protested and claimed that the bank had erred in honoring an earlier draft that had been forged by his wife. Assume also that the depositor became irate and demanded that the dishonored check be paid and that the balance of his account be paid over to him immediately. Must the bank comply? Can the bank delay action pending a determination of the validity of the allegedly forged instrument, without risking an award of punitive damages? If it is ultimately determined by litigation that the questioned instrument was in fact forged, can the jury reasonably infer that the bank intended from the beginning to dishonor or to delay payment of valid drafts and thus fraudulently induced the deposits, thereby negating the U.C.C. provisions governing wrongful dishonor?

Add to either of the foregoing hypotheticals a claimant who genuinely believes in his claim and a lawyer equally convinced and prone to write vituperative and accusative demands, and we have a case identical to the one before us. The case at bar differs from these hypotheticals only in that a jury verdict and a trial judge's ruling on a motion to correct errors have clothed the award with a presumption of correctness, and we are understandably hesitant to pierce that cloak. However, the plaintiff has simply failed in his burden of proof of elements to support punitive damages. His accusations and those of his lawyer simply are not probative evidence; and except for those accusations, all evidence is consistent with good faith.

Coming now to the majority statement that an independent tort is not a prerequisite to an award of punitive damages, the statement is not supported by case law. The majority has stated that a careful review of the case law leads to that conclusion, but it has cited no cases. Instead it cites Corbin on Contracts and Sedgwick on Damages. The quotation from 5 Corbin, § 1077 does refer to punitive damages in "* * * cases that contain elements that enable the court to regard

them as falling within the field of tort or closely analogous thereto" indicating that only tort elements, as opposed to a tort or tortious conduct would be required. I believe this is an unfortunate and erroneous inference. The section quoted from is not a treatise upon the law of punitive damages in contract actions. Rather, it is a pronouncement that such damages are not recoverable for breach of contract, with the caveat that there are certain exceptions. A detailed enumeration of the exceptions and their interplay between certain actions that are a mixture of tort and contract was not required in the context of this portion of the treatise, and I believe the quoted statement was casual and unguarded. At any rate, none of the cases cited in the footnote support the inference. On the contrary, it appears that in each case cited and in which punitive damages were allowed, there had been a tort committed and not merely unsavory conduct.

The quote from Sedgwick was taken from *Taber* v. *Hutson,* (1854) 5 Ind. 322, 325, as disclosed by the majority opinion. That case, however, was not a contract case but was one for assault and battery and false imprisonment. The quotation from Sedgwick was quite appropriate in that case. The formulation from Sedgwick obviously was related to tort cases. The word "mingle" accented in the majority opinion refers not to the mingling of the elements of fraud, malice, etc. in contract controversies but in tort controversies. The author, it appears was explaining that punitive damages are not allowable in all tort cases but only in those also embodying the especially reprehensible elements.

I confess to no familiarity with Mr. Sedgwick's works. The quote having appeared in the 1854 case, it obviously was taken from an earlier work. I do find Sedgwick's Sixth Edition, published in 1874, and the quotation there appears at page 35 in the introduction to the subject matter entitled "General View of the Subject." The discussion is a general introduction to the rules of damages. The text preceding it is, for the most part, related to the development of tort law.

Indeed, the following statement from page 33 under the heading of "Limits of Compensation," appears to be diametrically opposed to the statement from page 35, if the latter be regarded as applicable to contract cases.

> *"In all cases growing out of the non-performance of contracts,* and in those infringements of rights, or non-performance of duties, created or imposed by the law, in which there is no element of fraud, wilful negligence, or malice, *the compensation recovered in damages consists solely of the direct pecuniary loss,* which includes, in mere money demands, interest for the detention of the amount claimed, and the costs of the suit brought for the recovery of the demand." (Emphasis added).

Elsewhere in Sedgwick's Sixth Edition, we find the following statements reflective of the attitude of that day upon the matter of determining damages in contract actions:

> "* * *; in all cases of contract, the sole object of the court is to ascertain the agreement of the parties, and that agreement as a general rule, controls the measure of remuneration." (p. 238).

> "Motives of Contracting Parties Disregarded.—We have now to consider the exceptions which have been engrafted upon this general rule, that the contract as a matter of law fixes the damages. And the first that presents itself, is that growing out of the question whether the motives of the defaulting party are in any case to be taken into consideration.

> "It has been already said that our law makes a broad distinction on the subject of compensation between actions of contract and actions of tort, and while it permits the jury in the latter instance to take into consideration the intention of the offending party, to review all the circumstances of the case, and to make their verdict conduce to the purposes of punishment as well as compensation, that on the other hand in actions of contract the motive or animus of the defendant is entirely disregarded, and the damages are strictly limited to the direct pecuniary loss resulting from the breach of the agreement in question." (pp. 240, 241).

> "* * * It is to be borne in mind, that the rules of damages are all intended to conform to those other fundamental rules which determine the issue to be tried and the testimony on which it is to be decided. Pleading pre-

scribes the form of action, and declares the precise issue. Evidence points out the testimony to be given in support and discharge of the demand, while the damages are awarded in conformity to those rules which govern the proceedings in the cause down to the time of trial." (pp. 243, 244).

"* * * No form of action has yet been devised for the fraudulent breach of an agreement." (p. 244).

That evidence of tortious conduct, an independent tort, and not merely of "tort-like" conduct is a prerequisite to an award of punitive damages in contract actions is borne out by an abundance of cases, and we have been cited to none to the contrary. In the recent case of *Hibschman Pontiac, Inc.* v. *Batchelor*, (1976) Ind. App., 340 N.E.2d 377, cited with approval by the majority, our Court of Appeals said:

"However, there are exceptions to the general rule that punitive damages are not recoverable in breach of contract actions. When the conduct of a party to the contract has gone beyond mere breach and when the conduct amounts to or is accompanied by an independent willful tort, punitive damages may be recoverable even though the independent tort is not pleaded."

"We do not feel that the doctrine of punitive damages should be expanded to contract actions because:

"(1) Oppressive breaches of contract, unaccompanied by tortious conduct, do not warrant punishment through the medium of punitive damages.

"(2) Punitive damages are not the proper remedy for inadequate compensatory damages."

In the *Hibschman* case, the Court of Appeals reversed the award of punitive damages, notwithstanding a number of wrongful representations made by the defendant to the plaintiff, because it was evident that the defendant had not relied upon such representations, and hence no fraud had been committed.

In *Standard Land Corporation of Indiana* v. *Bogardus*, (1972) 154 Ind. App. 283, 289 N.E.2d 803, our Court of Appeals affirmed the judgment as to compensatory damages but reversed the award of punitive damages, saying:

"It must be noted that the special findings of fact did not find any fraud, although it did find that the contract 'imports oppression' and there was a 'spirit of wanton disregard of the rights of Macke.'" 289 N.E.2d at 820.

The doctrine is also clearly reflected by *Murphy Auto Sales, Inc., et al.* v. *Coomer, et al.,* (1953) 123 Ind. App. 709, 112 N.E.2d 589; *Voelkel* v. *Berry,* (1966) 139 Ind. App. 267, 218 N.E.2d 924; *Jerry Alderman Ford Sales, Inc.* v. *Bailey,* (1972) 154 Ind. App. 632, 291 N.E.2d 92, 294 N.E.2d 617; *Physicians Mutual Insurance Company* v. *Savage,* (1973) 156 Ind. App. 283, 296 N.E.2d 165.

In *Murphy Auto Sales,* the defendant had sold an automobile with a worn-out engine to a minor and his widowed mother. The following day, the engine fell apart. Punitive damages were awarded, and the Court of Appeals affirmed, expressly finding a fraud and reciting the evidence of fraudulent misrepresentations intentionally made and relied upon by the plaintiff. The action was for a rescission of the contract and damages for fraud.

In the *Voelkel* case, paragraph one was a standard complaint for breach of contract, and paragraph two repeated the allegations of paragraph one but added that "* * * well knowing himself to have promised the plaintiff the consideration mentioned hereinabove, and well knowing that plaintiff performed his part of the agreement mentioned hereinabove, nevertheless arbitrarily, and for no reason known to plaintiff, refused to perform his part of the agreement mentioned hereinabove, and by reason thereof demands exemplary and punitive damages * * *."

The trial court struck the second paragraph of complaint, and the Court of Appeals affirmed saying:

"We find no merit in this contention since appellant is asking that we distinguish between the two paragraphs due to the fact that the second paragraph asked for punitive damages. While it is true that this Court recently upheld an award of punitive damages in a contract reformation action, it was stated at that time that the trial court, sitting

in equity, had established fraud by the evidence and had awarded exemplary damages in conjunction with the reformation. Hedworth v. Chapman, (1963) 135 Ind. App. 129 at 133. One must bear in mind that in the above mentioned decision we stated that the upholding of the award required an extension of a minority holding. We feel that the rule of that case must be narrowly construed to apply only when the court, sitting in equity, finds fraud and in addition facts which positively require it in the interest of justice."

In the *Alderman Ford* case, the plaintiff had purchased a truck from the defendant, Alderman. It was defective and was returned for repairs. Alderman delivered it to the defendant, Central, who made the repairs. Thereafter, both Alderman and Central wrongfully refused to surrender the truck to the plaintiff. The suit was for both breach of warranty and for conversion. Punitive damages were awarded and affirmed, the Court of Appeals saying:

"Where acts constituting a breach of contract also amount to a cause of action in tort, there may be a recovery of exemplary damages upon proper allegations and proof. As sometimes stated, exemplary damages are recoverable for a tort committed in connection with, but independently of, the breach of contract, where the essentials of an award of such damages are otherwise present, the allowance of such damages being for the tort and not for the breach of contract. In order to permit a recovery, however, the breach must be attended by some intentional wrong, insult, abuse, or gross negligence which amounts to an independent tort."

The *Physicians Mutual* case, probably most resembles the case at bar, except in that case there was evidence of a fraud committed in the breach, whereas such evidence is lacking here. In that case, the plaintiff was the beneficiary of an insurance policy upon the life of his wife. Upon her death, Physicians Mutual falsely represented to the plaintiff that the policy had a rider invalidating the policy as to injury sustained in consequence of intoxication. The evidence disclosed that the wife was intoxicated at the time of death, but the policy contained no such rider. The plaintiff brought

suit upon the policy and additionally alleged the entitlement to punitive damages by reason of "defendant's wrongful and wilful denial of its contractual obligations." Punitive damages were awarded and affirmed. The Court of Appeals pointed out that the trial court specifically found fraud which would allow punitive damages, although the action was based upon contract. It further commented that the specific finding of fraud distinguished the case from the holding of *Standard Land Corporation* discussed above, where punitive damages were reversed because of the absence of such a finding.

This subject was recently annotated in 47 A.L.R.3d 316 (1973). An analysis of each cited case reveals that when the award of punitive damages was upheld, there was evidence from which an independent tort could have been found. Punitive damages were either denied by the trial court or reversed on appeal in a number of cases where the evidence reflected malicious wrong doing only, and I conclude that this is because there could be no end to the mischief that would come forth if the courts should begin to inquire into the motives of those who breach their contracts and to apply different measures of damages with varying degrees of culpability. Under such a rule, it follows that one who breached his agreement only because performance would have occasioned a great hardship, should be excused from performance or the payment of compensatory damages.

A case from the A.L.R. citation that is remarkably similar to the one at hand is *Vann* v. *Nationwide Insurance Company*, (1971) 257 S.C. 217, 185 S.E.2d 363. There, the plaintiff had a liquidated claim for medical benefits and an unliquidated claim for damages under an uninsured motorist provision of the same insurance policy. The provisions were severable. The defendant, with fraudulent intent according to the complaint, refused to pay the liquidated claim unless the plaintiff would also settle the unliquidated damage claim. The plaintiff proceeded to file suit, seeking punitive damages as well as those provided by the policy, and alleged that the defendant

engaged in a fraudulent scheme or plan to cheat and defraud the plaintiff of his rights due under the various provisions of the policy.

The court struck the allegations relating to the fraud and punitive damages, and the Supreme Court of South Carolina affirmed saying that there was not a fraudulent act, inasmuch as there was no change of position by the appellant in reliance upon the representations of the defendant. The Court said: "The respondent did nothing that would prevent the appellant from seeking to recover any actual damages which he may have by reason of the alleged breach of the contract or alleged failure to pay."

In *Dawkins* v. *National Liberty, etc.*, (D.S.C. 1966) 252 F. Supp. 800, the court distinguished the case before it from an earlier one where the plaintiff had elected to treat the insurance policy as void and sought to recover damages for fraud and deceit in its inducement and said:

"Mere failure or refusal to pay money, for whatever motive, is not a basis for an award of punitive damages without the requisite fraudulent act. * * * * While the complaint here reveals a pattern of behavior on the part of the defendant which would be reprehensible if true, there are no allegations properly setting forth a fraudulent act accompanying the breach of contract which would support punitive damages." 252 F. Supp. at 803.

The reported case giving rise to the foregoing A.L.R. Annotation, was *Fletcher* v. *National Life Insurance Company*, (1970) 10 Cal. App.3d 376, 89 Cal. Rptr. 78.

This case, in part at least, may represent a departure from the foregoing cited cases holding that punitive damages could be awarded for a breach of contract, only when the breach also gave rise to an independent action in tort. I say "may," because the court first decided that punitive damages were awardable in this case because the breach was accompanied by an independent tort, i.e. the California tort of intentionally inflicting emotional distress. After reaching that de-

cision, however, the court reached out with an additional finding. I quote from page 306.

"We hold, therefore, that defendants' threatened and actual bad faith refusals to make payments under the policy, maliciously employed by defendants in concert with false and threatening communications directed to plaintiff for the purpose of causing him to surrender his policy or disadvantageously settle a nonexistent dispute is essentially tortious in nature and is conduct that may legally be the basis for an action for damages for intentional infliction of emotional distress. We further hold that, independent of the tort of intentional infliction of emotional distress, such conduct on the part of a disability insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recovered to compensate for all detriment proximately resulting therefrom, including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages." 47 A.L.R.3d at 306.

The court justified its additional holding (or dicta, whichever it may be) rationalizing that the law recognizes, as a tort, the intentional interference with one's contractual relations with a third party and that there was no sound reason why plaintiff's legally recognized interest should receive less protection from interference by the insurer than from an outside party or why an insurer should be held to a lower standard of conduct than a stranger.

The jury's verdict in the last mentioned case was for $60,000.00 compensatory damages and $640,000.00 punitive damages, the trial court, however reduced the award of punitive damages to $180,000.00, which the Court of Appeals also affirmed.

The foregoing appears to be a case of first impression. It should also be noted that it is not a Supreme Court decision. The Supreme Court of California has, however, more recently given its approval to the Fletcher additional holding in *Gruenberg* v. *Aetna, etc.,* (1973) 108 Cal. Rptr. 480, 510 P.2d 1032.

There are several additional reasons why the judgment for punitive damages should be set aside in this case.

By their answers to the complaint, the defendants admitted liability but alleged the failure of the plaintiff to file a proper proof of loss, thereby putting the amount of compensatory damages squarely at issue. They denied the allegations of bad faith and wantonness and moved for the dismissal of the paragraphs seeking punitive damages for failure to state a claim for which relief could be granted. At the conclusion of the evidence, the defendants moved for judgments upon those paragraphs of complaint seeking punitive damages, and the motion was denied. The defendants' requested Instruction No. 1 would have directed a verdict against each defendant in the sum of $23,527.02 (the sums which this Court has found was owing as a matter of law) as opposed to the $31,250.00 which the plaintiff was seeking from each defendant. This instruction was refused. We have corrected this error insofar as it permitted an improper award of compensatory damages. However, it is my opinion that the refusal of the tendered instruction erroneously affected the jury's decision upon the punitive damage issue as well as upon the compensatory issue.

If the jury was warranted in awarding punitive damages, and the majority has held that it was, it was because it believed that there was bad faith in the defendants' refusal to pay the face amount of the policies. The jury obviously concluded that the face amounts were due and had been refused in bad faith. Had the tendered instruction been given, the jury would have known, as we do, that the plaintiff's claim was excessive; and it appears unlikely that it would have attributed the defendants' refusal to pay the plaintiff to a larcenous desire to avoid its legal obligations. It may require some speculation to conclude that the jury would not have awarded punitive damages had it been aware that there was an area of the dispute wherein the defendants were right and the plaintiff was wrong. It requires greater speculation,

however, to conclude that had the jury had this pertinent information it would have, nevertheless, made the punitive award. It simply is not consistent with my concept of justice that one party should be rewarded and the other penalized as the result of a dispute, when it has been determined that each was in part right and in part wrong. That anomaly having followed the denial of a tendered proper instruction which likely would have averted it, the injured party should, at the very least, be entitled to a new trial upon that issue.

The defendants' act which, according to the majority, was tortious, was the violation of Ind. Code § 27-1-22-18 (Burns 1975), an attempted extraction from the plaintiff of an unauthorized premium. This misdeed, if committed, was a criminal offense for which the defendants, and not merely their agents, are subject to criminal prosecution under the same act. Ind. Code § 27-1-22-20 (Burns 1975). Although it appears to be a minority rule, it is, nevertheless, the law of this state that exemplary damages may not be given where the act is punishable as a crime. *The Wabash Printing & Publishing Co. et al.* v. *Crumrine*, (1889) 123 Ind. 89, 21 N.E. 904, and cases there cited; *The Louisville, New Albany & Chicago R.R. Co.* v. *Wolfe*, (1890) 128 Ind. 347, 27 N.E. 606. The stated reason for this rule is that the wrongdoer might otherwise be subject to double jeopardy. However, it also seems to be consistent with the universally accepted reason for allowing punitive damages, i.e. to punish the wrongdoer in cases where the actual damages are insufficient for such purpose and thereby to deter him and others from similar misconduct in the future. There seems to be no need for such punishment and deterrent, where statutory agencies and criminal laws have been established to regulate the conduct and to punish violators.

The majority has referred to the statute prohibiting insurance companies from receiving premiums, in excess of those established by law, as a statutory scheme to protect the public and has stated that public policy, therefore, permits

punitive damages in furtherance of the statutory scheme. It is, therefore, appropriate to examine another statute aimed at protecting the public against unconscionable acts of insurance companies. I refer to Ind. Code § 27-4-4-5 (Burns 1975), which provides for an award of attorney's fees against unauthorized insurance companies that delay or refuse to make payment vexatiously or without reasonable cause. Such fees are limited to twelve and one-half percent of the recovery, which in this case would have amounted to $5882.00 as compared to $34,000.00 punitive damages allowed. If the defendants were guilty of any misconduct whatever, it fell squarely within the purview of this statute, but for the defendants being authorized to deal within the state and thereby subject to all of its statutory and regulatory mandates and proscriptions. It is obvious to me that the Legislature—the proper body to formulate public policy—has concluded that the insurance statutes and regulations of this state are adequate to protect the public against unreasonable or vexatious delays in payment by regulated companies. Otherwise, there would have been no reason for Ind. Code § 27-4-4-5 to have been made applicable only to unauthorized companies. The ruling of the majority assesses a penalty against authorized companies nearly six times as great as the maximum that could have been imposed against a company "bootlegging" its policies within the state and thus avoiding the control to which domestic and authorized alien companies are subject. I do not agree that such results comport to any public policy.

Although paragraphs two and three of the complaint prayed for punitive damages, the case was litigated only as one for breach of contract. Our recently revised trial rules have been designed with a liberal view towards a determination of disputes upon their merits. Under Ind. R. Tr. P. 15(B) issues not raised by the pleadings may, nevertheless, be determined, if tried by express or implied consent of the parties. This rule, however, should not permit a case to be litigated upon one count and a recovery awarded upon another not

within the contemplation of the parties. Issues are drawn today by pleadings and orders following pre-trial conference. A clear understanding of the issues, prior to and during trial, is essential to a fair and orderly trial. The issues, however formed, control the admissibility of evidence. As has been acknowledged by the majority, the general rule is that a promisor's motive while breaching a contract is regarded as irrelevant. *Pirchio* v. *Noecker*, (1948) 226 Ind. 622, 82 N.E.2d 838. Should the appendage of a prayer for punitive damages to a complaint for breach of contract alter this rule? If so, where are the limits of admissibility, and how may a jury be confined to a consideration of the relevant only?

Although paragraph two and three of the complaint alleged bad faith and wantonness and prayed for punitive damages, there was no tort flavor to the trial and most certainly no gravamen of fraud in the inducement. There were no allegations of fraud in the complaint and no mention of it came into the pre-trial order. If the plaintiff intended to prove fraud, Ind. R. Tr. P. 9(B) required the circumstances thereof to be specifically averred. As the issues were formed and tried, the defendants have had no opportunity to defend against a charge of fraud in the inducement. The thought obviously had not entered the minds of the litigants and, I submit, that it did not occur to the jury.

The majority opinion also attaches particular significance to the defendants' knowledge of the plaintiff's need for the policy proceeds, if he was to rebuild the destroyed premises. This is hardly a unique situation in insurance cases! And it does not alter the rules of damages in contract cases. The plaintiff was entitled to receive the amount of money agreed upon by the contract of insurance, upon due proof of loss, and to interest upon such amount, if payment was improperly withheld—no more and no less. That the plaintiff was grossly underinsured is, indeed, unfortunate but does not alter the laws of contracts and damages.

"There are many classes of cases where consequential damages may be recovered for the violation of a contract, when such recovery may by considered as fairly within the contemplation of the parties as proximately flowing from the breach. But we have been unable to find any case, nor have we been furnished one by counsel for plaintiff, where such damages may be recovered upon the breach of a promise solely to lend or pay money, except to the extent of placing the complaining party in the exact position that he would have occupied had the contract not been breached;" *Clark* v. *Life & Casualty Insurance Co., supra,* 53 S.W.2d at 969.

"As stated by counsel for plaintiff—appellant the sole question presented is whether an insurance company can be held liable as upon a breach of contract for damages in amounts in excess of the insured benefits contracted for because the company, through its agents, knew of the special purpose to which the insured contemplated applying any disability payments to which he might be entitled and thus contracted with reference thereto or because of general averments of fraud, malice, bad faith and the like. * * * *

"Counsel for plaintiff had cited a number of cases in which courts have held that the failure to pay money under certain conditions gave rise to a cause of action in addition to the recovery of the money. We have examined these cases and cannot bring ourselves to the view that the plaintiff is in the position of any of the litigants in the cited cases.

"He simply stood as one seeking to enforce a contract against the insurance company. The company had a right to negotiate for a settlement of his claim and a right in good faith to delay payment of the claimed monthly benefits of $300.00 even though such a denial reduced the plaintiff to the alleged condition arising from lack of finance and rendered him unable to pay his premium on his $25,000.00 insurance. This is so even though the plaintiff's claim is established that this was the purpose of the policy so known to the company. The insurance company could assume no such obligation. Its liability was limited to the terms of the policy. On the other hand the plaintiff had a right to bring an action as soon as the company defaulted." *Haas* v. *Pacific Mutual Life Insurance Co. of California, et al., supra,* 41 N.E.2d at 264-66.

This matter was summed up by the court in *Scottish Union & National Insurance Co.* v. *Bejcy, et al.,* (6th Cir. 1953) 201 F.2d 163, where it was said:

"To extend the coverage of an ordinary fire insurance policy and so to enlarge the hazard which an insurer assumes that everything injurious, which may follow in point of time a failure to pay a loss, would result in so great an increase in the cost of insurance as to make protection unavailable to most persons, and render actuarial studies a useless guide." 201 F.2d at 166.

It is agreed that punitive damages are to punish and deter the wrongdoer and not intended as compensation for the recipient. The record in this case reflects that the plaintiff had a fire loss to the extent of $94,108.09 but that he was insured only to the extent of fifty percent or $47,054.04. I cannot regard it as mere coincidence that the jury award of punitive damages, added to its award of compensatory damages in an erroneous amount came to $96,500.00. It is apparent, to me, that the jury, for reasons not supported by the record desired to make the plaintiff whole.

For the reasons hereinabove, I would vacate the award of punitive damages.

DeBruler, J., concurs.

NOTE.—Reported at 349 N.E.2d 173.